COURT OF APPEALS OF VIRGINIA


Present:  Judge Bray, Senior Judges Cole and Overton
Argued at Richmond, Virginia


W. PETTUS GILMAN

v.    Record No. 0733-99-2

JUDITH COCHRANE GILMAN
                                           OPINION BY
and                                 JUDGE MARVIN F. COLE
                                         APRIL 4, 2000
JUDITH COCHRANE GILMAN

v.    Record No. 0766-99-2

W. PETTUS GILMAN


          FROM THE CIRCUIT COURT OF HANOVER COUNTY
                 Richard H. C. Taylor, Judge

        L. B. Cann, III (Christopher L. Perkins;
        George B. Little; LeClair Ryan, P.C.; Little,
        Parsley & Cluverius, on briefs), for
        W. Pettus Gilman.

        Donald K. Butler (Ann Brakke Campfield;
        Morano, Coleman & Butler, on briefs), for
        Judith Cochrane Gilman.


     W. Pettus Gilman (Pettus) and Judith Cochrane Gilman (Judy)

each appeal from the final equitable distribution decree entered

by the Hanover County Circuit Court (trial court).  We have

consolidated these appeals for the purposes of this decision.

Pettus contends the trial court erred by 1) rejecting the 56%/44%

division of marital property recommended by the commissioner; 2)

classifying certain property as marital instead of as his separate

property; and 3) finding that his separate interest in Assets 4 and 5 was not traceable. Judy contends the trial court erred by 1) classifying 220 shares of Overnite Transportation stock that Pettus purchased during the marriage as his separate property; 2) classifying the Stone note as Pettus' separate property; 3) failing to award her more than one-half of the marital estate; and 4) failing to award her attorney's fees and expert witness fees. For the reasons that follow, we affirm the trial court in part and reverse it in part.

<u>Background</u>

The parties married on July 25, 1959. Pettus brought into the marriage 600 shares of Overnite Transportation stock that he had purchased on the advice of Judy's father (the founder of Overnite Transportation), and shares of Southern States Cooperative, Inc., preferred stock. Pettus also had a savings account, and he had substantial land holdings he inherited from his father prior to the marriage. Pettus' total income for 1959 was $1,850.74. He earned approximately $4,800 in 1960.

On or about January 4, 1960, Pettus sold his Southern States preferred stock for approximately $5,000. Between February 29 and March 16, 1960, Pettus purchased 220 additional shares of Overnite Transportation stock for $2,250. He testified that he purchased

the additional shares using the proceeds from the sale of the Southern States stock.[1]

During the marriage, the parties maintained separate stock ledgers on which they listed the stocks they owned individually and jointly. Judy entered the 220 shares of Overnite Transportation stock in Pettus' stock ledger. Judy's accounting expert, William King Stephens, testified that he found no instance where Pettus used his own money to purchase stock for Judy, and Stephens found no "definitive proof" that Judy ever used her money to buy stock for Pettus. Judy told Stephens that she "wasn't sure" whether she used her own money to buy the 220 shares of Overnite Transportation stock.

Sometime after March 16, 1960, Judy used her separate funds to buy shares of stock in the Country Club of Virginia. She put the stock shares in Pettus' name, but had Pettus give her a letter indicating that her funds were used to purchase the stock. Judy admitted she had no such documentation from Pettus regarding the 220 shares of Overnite Transportation stock.

In 1963, Pettus embarked on a career in the insurance business. He started by working as an insurance agent with Travelers Insurance. In 1968, he and Russell Childress formed the Gilman & Childress insurance agency. Pettus testified that he

---

[1] Due to stock splits, the number of Overnite Transportation shares Pettus held eventually increased to 30,000, but he purchased no additional shares after March 16, 1960.

worked between forty and fifty hours per week at Gilman &
Childress.[2]

Pettus invested in a series of real estate development
ventures during the course of the marriage.  In 1971, Pettus and
Bob Downing purchased a 79.9 acre tract of land for $97,000, with
each man contributing $5,000 of a $10,000 downpayment.  Pettus
borrowed his share of the downpayment from Hanover National Bank.
Because, at the time, the bank would not lend money secured by
undeveloped land, Pettus pledged shares of his Overnite
Transportation stock as collateral.  Pettus and Downing financed
the balance of the purchase price with a five-year balloon note
in the amount of $87,000 issued by the sellers.

The 79.9 acre tract remained undeveloped for the next twelve
years.  In 1983, Pettus and Downing formed Dow-Gil, LTD (Dow-Gil),
to develop the property.  The men deeded the property to Dow-Gil
and subsequently obtained a $750,000 loan from Union Bank & Trust
(UB&T) to develop the land.  Pettus testified that UB&T appraised
the value of the undeveloped property at $487,392.  The $750,000
loan financed the construction of a road and a water and sewer
pumping station on the property.  After these improvements were
completed, the bank appraised the property at $2,487,795.

_____

[2] The commissioner classified the insurance agency as
marital property.

- 4 -

Pettus submitted a personal financial statement during the loan application process and pledged 3,500 shares of Overnite Transportation stock and all his shares in Dow-Gil as security for the UB&T loan. The balance of the loan was secured by the land. Judy (and Downing's wife, Betty) co-signed a guaranty, but Judy did not submit a financial statement as part of the loan application process. The bank required the wives' signatures as a matter of procedure because of its concern about dower rights in the event either Pettus or Downing died. Pettus neither included Judy's separate assets nor her share of the couple's joint assets in the financial statement he submitted to obtain the loan.

Pettus testified that the $750,000 loan was repaid from sales proceeds as Dow-Gil began selling parcels of the original 79.9 acre tract. He further testified that in 1983, when Dow-Gil started receiving funds from the loan and proceeds from the sale of lots, money was distributed to the owners (Pettus and Downing), who used it to pay off the $5,000 and $87,000 acquisition loans.[3] There was no evidence that marital property or Judy's separate property was used to repay any of the purchase-price obligations.

---

[3] Pettus testified that subsequent to 1971, he had borrowed money from First Virginia Bank to pay the interest due on the $5,000 downpayment loan. In a trial court pleading, Pettus represented to the commissioner that the balloon note was paid off in 1976, when Pettus refinanced his share of the obligation.

Pettus presented evidence regarding several other pieces of property that were acquired, in whole or in part, with Dow-Gil distributions, including the Goodwill property (asset 16),[4] Roberts/Gardner (asset 17), Tuffy Muffler (asset 20), and the Ashcake Village Shopping Center (Gilman Investments, asset 23).[5] Judy was not involved in the acquisition of any of these assets.

Pettus did not play an active role in the development or management of Dow-Gil. After the Dow-Gil acreage was purchased in 1971, Pettus' involvement in developing the land was essentially limited to providing the name for the main road paved on the property: Dow-Gil Road. Downing was an engineer and surveyor, and he used his talents and expertise to oversee the actual development of the property. Downing also "kept the books, made the requisitions and managed the money."

In 1972, Pettus, Downing, and attorney Judson Vaughan formed Virginia Commonwealth Investors (VCI) for the purpose of constructing an office building. To pay the $12,500 cost of the

---

[4] Virginia Commonwealth Investors, of which Pettus was a part-owner, actually purchased the Goodwill property from Dow-Gil, but Pettus used a $25,000 distribution from Dow-Gil to purchase his share of Goodwill.

[5] Pettus testified that part of his contribution toward the purchase price of Ashcake Village was a $36,000 disbursement from Dow-Gil and $40,000 he withdrew from his Alex Brown account. The Alex Brown account was classified by the commissioner as marital property because Pettus deposited a $200,000 Dow-Gil distribution into the account in early 1989. The account also contained proceeds from the sale of Pettus' Overnite stock.

land upon which the office was to be constructed, plus other associated costs, each participant contributed $5,000.  Pettus borrowed his contribution from Hanover National Bank and pledged his Overnite Transportation stock as collateral for the loan.[6]

Pettus, Downing and Vaughan subsequently borrowed $85,000 to construct an office building on the property.  This loan was secured by a deed of trust on the property, was not guaranteed by Judy, and was repaid with rents paid by the office building's tenants.[7]  Downing performed all the engineering and surveying work and supervised the construction of the office building.  Downing was also responsible for collecting rents once the building was completed.

In 1975, VCI obtained a $185,000 loan from United Virginia Bank.  The loan was secured by a deed of trust on the VCI property.  Judy's credit was not involved in securing this loan, and she did not sign a guaranty.  The loan proceeds were used to refinance the original $85,000 construction loan and to expand the existing office building.  The remaining balance of $40,000 was used to purchase property that was leased to Clayton Mobile Homes (asset 18a).  The $185,000 loan was repaid with tenant rents.

---

[6] Pettus explained that he had a "blanket pledge" of Overnite Transportation stock to cover his regular borrowing from Hanover National Bank.

[7] The tenants included Gilman & Childress, Downing's engineering business, and Vaughan's law practice.

In 1988, using financing arrangements essentially identical to the two prior VCI loans, VCI purchased the Wilson-Finley property. Vaughan located the property. Judy did not participate in the financing of this acquisition.

Pettus indicated that he was essentially a silent partner in VCI, uninvolved in the day-to-day operations of the business. Downing handled VCI's bookkeeping until his death, at which time his widow, Betty Downing, took over these responsibilities. Vaughan performed any necessary legal work for the corporation.

The commissioner in chancery found that the 220 shares of Overnite Transportation stock that Pettus purchased during the marriage were Pettus' separate property. With regard to Dow-Gil and VCI, the commissioner held that Pettus' use of stock pledges to obtain downpayment loans did not constitute an "exchange" under Code § 20-107.3. The commissioner concluded, therefore, that Dow-Gil and VCI were marital property.

The commissioner further found that, regardless of the merits of Pettus' argument regarding the stock pledges,

> [Pettus] contributed substantial marital effort, skill and expertise toward the development of Dow-Gil and all other real estate investments during the marriage to Judy and the expenditure of that "personal effort" would certainly transform the vast bulk of the value of those assets to marital property.

The commissioner concluded that the marital effort Pettus used in these investments made it impossible to trace Pettus'

- 8 -

separate contribution.  Because the commissioner classified
Dow-Gil and VCI as marital property, other assets funded in-part
or completely with Dow-Gil or VCI funds were classified as
either hybrid or marital property.[8]

The commissioner found the total value of the parties'
property to be $11,171,896.  Of this amount, the commissioner
classified $6,003,094 as Judy's separate property, $1,944,797 as
Pettus' separate property, and $3,224,005 as marital property.
The commissioner found that Judy's adultery had been the
preponderant cause of the parties' divorce.  Based on this and
the other statutory factors, the commissioner recommended that
56% of the marital estate be awarded to Pettus, and 44% to Judy.

The commissioner ruled that the parties would share equally
in the commissioner's expenses and the cost of transcripts, and
he declined to award Judy any costs or fees.

The trial court affirmed the commissioner's report, with
the exception of the division of the marital estate.  The trial

---

[8] The assets classified as marital or hybrid due to the
commissioner's finding that Dow-Gil and VCI were marital
properties included:  Springmeadow (assets 4 and 5); the
Commonwealth Building (asset 15); Goodwill (asset 16);
Roberts/Gardner (asset 17); Wilson-Finley (asset 18); Clayton
Homes (asset 18a); Tuffy Muffler (asset 20); Gilman Investments
(asset 23); 4.35A Dow-Gil, the land remaining from the original
Dow-Gil purchase (asset 26); Alex Brown (asset 35); Crestar
Dow-Gil (asset 45); Gilman Investments CD (asset 46a); Savings
Account w/ Downing (asset 46c); Checking Account w/ Downing
(asset 46d); Dow-Gil Note (asset 68a); and Dow-Gil Distribution
(asset 68b).

judge explained that he believed the commissioner had sufficient "evidence on every call he made except the marital split, and I agree with [counsel for Judy], it ought to be a 50/50 split and not a 56/44 split."

## Standard of Review

"In reviewing an equitable distribution award on appeal, we have recognized that the trial court's job is a difficult one, and we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances that are presented in each case." Klein v. Klein, 11 Va. App. 155, 161, 396 S.E.2d 866, 870 (1990). "A decision regarding equitable distribution . . . will not be reversed unless it is plainly wrong or without evidence to support it." Rahbaran v. Rahbaran, 26 Va. App. 195, 205, 494 S.E.2d 135, 139 (1997). See also Barker v. Barker, 27 Va. App. 519, 531, 500 S.E.2d 240, 245-46, (1998).

"We review the evidence in the light most favorable to . . . the party prevailing below and grant all reasonable inferences fairly deducible therefrom." Anderson v. Anderson, 29 Va. App. 673, 678, 514 S.E.2d 369, 372 (1999). Although the report of a commissioner in chancery does not carry the weight of a jury's verdict, see Code § 8.01-610, "'an appellate court must give due regard to the commissioner's ability, not shared by the chancellor, to see, hear, and evaluate the witnesses at first hand.'" Jarvis v. Tonkin, 238 Va. 115, 121-22, 380 S.E.2d 900,

904 (1989) (citation omitted). "A commissioner's findings of fact which have been accepted by the trial court 'are presumed to be correct when reviewed on appeal and are to be given "great weight" by this Court. The findings will not be reversed on appeal unless plainly wrong.'" Barker, 27 Va. App. at 531, 500 S.E.2d at 245-46 (citation omitted).

### 220 Shares of Overnite Transportation Stock

"[A]ll property acquired by either spouse during the marriage and before the last separation of the parties is presumed to be marital property . . . ." von Raab v. von Raab, 26 Va. App. 239, 248, 494 S.E.2d 156, 160 (1997). "The party claiming that property should be classified as separate has the burden to produce satisfactory evidence to rebut this presumption." Stroop v. Stroop, 10 Va. App. 611, 615, 394 S.E.2d 861, 863 (1990).

Pettus testified that he purchased the 220 shares of Overnite Transportation stock using the proceeds from the sale of his Southern States preferred stock, which he sold for $5,000 shortly before acquiring the additional Overnite Transportation shares. The income tax records indicate that Pettus' income as of the dates of purchase was insufficient to enable him to afford the stock purchases. Moreover, the evidence proved the parties maintained meticulous records to keep track of their separate assets and that Judy had recorded these shares in Pettus' separate stock ledger. Stephens, a certified public accountant employed by

- 11 -

Judy to examine all of her financial records from the date of the marriage, testified that he could not trace to Judy the source of the funds used to purchase this stock.

Judy contends the commissioner impermissibly shifted to her the burden of proving that the shares were marital property. We disagree. In his report, the commissioner specifically noted that Pettus had the burden of rebutting the statutory presumption that the shares were marital property. While the commissioner commented that Judy presented no evidence that the shares were purchased with her separate property, a fact finder does not shift the burden of proof merely by comparing the relative weight of evidence presented by the parties. Accordingly, we conclude the commissioner did not shift the burden of proof to Judy and that Pettus presented sufficient evidence to prove that the 220 shares of Overnite Transportation stock were his separate property.

### Dow-Gil and VCI

Separate property is defined, in part, as "all property, real and personal, acquired by either party before the marriage" and "all property acquired during the marriage in exchange for or from the proceeds of sale of separate property, provided that such property acquired during the marriage is maintained as separate property." Code § 20-107.3(A)(1) (emphasis added).

Pettus contends his pledge of his Overnite Transportation stock as security for the Dow-Gil and VCI downpayment loans

- 12 -

constituted an "exchange" under Code § 20-107.3(A)(1).  Judy

responds that, because the bank never obtained title to the

shares, there was no exchange.  Judy further contends that, with

regard to the Dow-Gil property, the evidence was insufficient to

prove Pettus borrowed the "seed" loans or pledged Overnite

Transportation shares as security for the loans.

As a preliminary matter, despite the fact that Judy prevailed

on this issue, we reject her argument regarding the sufficiency of

the evidence.  Pettus testified that he borrowed the Dow-Gil and

VCI downpayments and pledged his stock as security for these

loans.  This testimony was neither impeached nor rebutted and was

accepted by the commissioner and the trial court.  Accordingly, we

must determine whether, based on Pettus' evidence, an "exchange"

occurred.

> A pledge is a bailment of personal
> property as security for a debt.  It is the
> lien created by the delivery of personal
> property by the owner to another upon an
> express or implied agreement that it shall
> be retained as a security for an existing or
> future debt.  The essential elements of a
> pledge are that possession of the pledged
> property passes from the debtor to his
> creditor, that legal title remains with the
> debtor and that the creditor has a lien for
> payment of the debt due him by the debtor
> . . . .

68A Am. Jur. 2d Secured Transactions § 119 (2d ed. 1993).

Whether a stock pledge constitutes an "exchange" is an issue

of first impression in Virginia.  We were confronted with a

- 13 -

roughly analogous situation involving the mortgaging of real property in Hurt v. Hurt, 16 Va. App. 792, 433 S.E.2d 493 (1993). There, one of the issues was whether any marital assets had been commingled with a bank account that the husband claimed as his separate property.  One of the sources of the husband's "income" was loan proceeds the husband obtained by mortgaging his separate real estate.

> Husband's standard practice was to borrow up to one hundred percent of any equity in the properties he held.  This provided him with liquid assets without realizing "income" for taxation purposes.  Generally, borrowed funds produced from this method of "cashing-out" the equity of husband's separate property is not considered "earned income" for services rendered during the marriage.  As such, these funds are classified as separate property unless commingling has occurred.

Id. at 797 n.2, 433 S.E.2d at 496 n.2 (emphasis added).

The commissioner reasoned that Hurt was distinguishable because in Hurt the husband lost equity in the property and the lender obtained legal title to the mortgaged asset.  Under the circumstances, however, we see this as a distinction without a difference.

Although Pettus retained legal title to the pledged shares, he surrendered rights to the stock that full legal title normally entails, namely, the unrestricted right to sell or transfer the shares to a third party.  Pettus surrendered possession of the stock, and his right to unilaterally sell the

- 14 -

stock, in exchange for the loan proceeds.  As in Hurt, Pettus used separate property to obtain loan proceeds without permanently alienating the collateral.  Although the transactions are structured differently, they share the common element of compromising the borrower's full ownership rights in an asset in order to use that asset as security for a loan.

We are satisfied that treating a stock pledge as an exchange is consistent with the legislative intent behind Code § 20-107.3(A)(1).  Where no marital property, effort, or credit is involved, a stock pledge is simply a method to use separate property to acquire additional property.  We see no equitable rationale for classifying property acquired in this manner as marital property.  Accordingly, we hold that the Dow-Gil and VCI stock pledge agreements constituted exchanges of separate property under Code § 20-107.3(A)(1).

Judy nevertheless asserts that Dow-Gil should be considered marital property because Pettus presented no evidence on how the balloon note was repaid.  She contends that, in the absence of any evidence from Pettus, there is a presumption that marital funds were used to pay that debt.

The discharge of a debt secured by an asset that results in an increase in equity in the asset constitutes an "increase in value."  See Code § 20-107.3(A)(1); Moran v. Moran, 29 Va. App. 408, 413-14, 512 S.E.2d 834, 836 (1999); Peter N. Swisher et

- 15 -

al., Virginia Family Law, app. to Chapter 11, p. 564 (2d ed. 1970).  "The increase in value of separate property during the marriage is separate property, unless marital property or the personal efforts of either party have contributed to such increases and then only to the extent of the increases in value attributable to such contributions."  Code § 20-107.3(A)(1).  The non-owning spouse has the burden of proving that the increase in value was attributable to the contribution of marital property.  See Code § 20-107.3(A)(3)(a).

The repayment of the purchase-price loans increased the "value" of the Dow-Gil land.  Because Pettus purchased this asset using loan proceeds that were his separate property, the land was his separate property, and Judy had the burden of proving that marital funds were used to discharge the loans.  See Moran, 29 Va. App. at 413-14, 512 S.E.2d at 836 (finding that the parties acquired "value" in the house that wife purchased prior to the marriage when marital funds were used to pay down the mortgage on the house and that husband had proved "that a portion of the equity in the . . . property could be traced to marital funds").

Judy presented no evidence that marital funds were used to pay any portion of the balloon note.  Indeed, the evidence when viewed as a whole established that Pettus was scrupulous in not

using marital funds to satisfy any of the monetary obligations incurred when purchasing his separate investment properties.

Judy finally contends, and the trial court and commissioner so found, that Pettus contributed substantial personal effort toward the development of Dow-Gil, VCI, and the other investment properties.

Where a party alleges that the increase in value of an asset is attributable to the personal efforts of one of the parties, that personal effort "must be significant and result in substantial appreciation of the separate property if any increase in value attributable thereto is to be considered marital property."  Code § 20-107.3(A)(1).

> [T]he nonowning spouse shall bear the burden of proving that (i) contributions of marital property or personal effort were made and (ii) the separate property increased in value.  Once this burden of proof is met, the owning spouse shall bear the burden of proving that the increase in value or some portion thereof was not caused by contributions of marital property or personal effort.
>
> "Personal effort" of a party shall be deemed to be labor, effort, inventiveness, physical or intellectual skill, creativity, or managerial, promotional or marketing activity applied directly to the separate property of either party.

Code § 20-107.3(A)(3)(a).

> The increase in value of separate property becomes marital if the expenditure of marital funds or a married party's personal efforts generated the increase in

> value.  The significant factor, however, is not the amount of effort or funds expended, but rather the fact that value was generated or added by the expenditure or significant personal effort.

Moran, 29 Va. App. at 412, 512 S.E.2d at 836.  The non-owning spouse has the burden of proving that the contribution of personal effort caused the increase in value.  See Martin v. Martin, 27 Va. App. 745, 751, 501 S.E.2d 450, 453 (1998) (en banc).  "To the extent the non-owning spouse claims that the increase in value was attributable to personal efforts, the non-owning spouse must prove that the personal efforts were 'significant' and resulted in 'substantial appreciation' of the owning spouse's separate property interest."  Id. (citation omitted).

Judy presented no evidence regarding the scope of Pettus' activities with regard to his separate investment properties. Pettus, on the other hand, stressed that he focused his marital efforts on the Gilman & Childress insurance agency.  Pettus repeatedly testified that his fellow shareholders handled the day-to-day development and operation of the various investment properties.  While Pettus undoubtedly employed intellectual skill in selecting properties to be purchased, the evidence was insufficient to prove that Pettus contributed "significant" personal effort that was the proximate cause of "substantial appreciation" in the value of these assets.

- 18 -

Accordingly, we hold that Pettus proved that Dow-Gil and VCI were his separate property. Judy failed to prove that any marital property was contributed to increasing the value of these assets. She also presented insufficient evidence to prove a substantial increase in value in Dow-Gil or VCI that could be attributed to the significant personal efforts of either party.

### Assets 4 & 5

On May 24, 1989, the parties purchased a 62.53 acre parcel of land (Assets 4 and 5) that adjoined the parties' residence, Springmeadow. Pettus paid for this property with a $78,275 check written from his First Virginia Bank (FVB) account.[9] The evidence proved that Pettus deposited $25,000 from his Alex Brown account into the FVB account on April 14, 1989, and $20,000 from Alex Brown on May 22, 1989. He also deposited $103,989.04 into FVB on April 24. Ninety percent of that deposit was his separate money. Immediately prior to the $20,000 May 22 deposit, the FVB account contained insufficient money to purchase Assets 4 & 5.

Although recognizing that some separate funds had been utilized to purchase this parcel, the commissioner ruled that there was "no possible way for the Court to determine the precise separate amount and as such, that separate amount

_____

[9] The commissioner's report reflects that the parties agreed to the classification of this account as a marital asset.

- 19 -

'transmutes by commingling' and the entire parcel becomes marital."

"According to Code § 20-107.3(A)(3)(e), '[w]hen marital property and separate property are commingled into newly acquired property resulting in the loss of identity of the contributing properties, the commingled property shall be deemed transmuted to marital property,' unless the contributed property is retraceable and not a gift."  Barker, 27 Va. App. at 531, 500 S.E.2d at 246 (citation omitted).

> In order to trace the separate portion of hybrid property, a party must prove that the claimed separate portion is identifiably derived from a separate asset.  This process involves two steps:  a party must (1) establish the identity of a portion of hybrid property and (2) directly trace that portion to a separate asset.

Rahbaran, 26 Va. App. at 207, 494 S.E.2d at 141.  "[T]he party claiming a separate interest in transmuted property bears the burden of proving retraceability."  von Raab, 26 Va. App. at 248, 494 S.E.2d at 160.

In light of our holding that Dow-Gil is Pettus' separate property, the proceeds of the Alex Brown account as of April and May 1989 would have been Pettus' separate property.  See Code § 20-107.3(A)(3)(a) (income produced by separate assets is marital property only to the extent that it can be traced to marital effort).  Moreover, because the FVB account contained insufficient funds to purchase Assets 4 & 5 prior to the May 22,

- 20 -

1989 Alex Brown deposit, at the very least, part of the purchase price can be traced to that deposit. Accordingly, on remand, the trial court should, in the exercise of its sound discretion, reassess Pettus' separate share of Assets 4 and 5 consistent with this opinion and the rules of tracing.

### The Stone Note

In 1987, Pettus purchased a mortgage note for $51,000. Accountant Charles Walton traced $35,000 of the purchase price to Pettus' separate property but could not ascertain the origin of the remaining $16,000. At oral argument, Pettus conceded the commissioner erred by classifying the entire note as Pettus' separate property. Accordingly, in dividing the parties' property on remand, the trial court should classify $16,000 (or 31.4%) of the Stone note as marital property.

### Equitable Division of the Marital Property

Both parties contend the trial court erred in dividing the parties' marital property. Because of our holding that a substantial amount of Pettus' separate property was mis-classified as marital property, the trial court will have to reconsider the division of the parties' marital property on remand. See Code § 20-107.3(E). The specific contentions of the parties are, therefore, moot. On remand, however, in considering the circumstances that contributed to the dissolution of the marriage, see Code § 20-107.3(E)(5), the

- 21 -

trial court should be cognizant of the Supreme Court's decision

in Hill v. Hill, 227 Va. 569, 318 S.E.2d 292 (1984):

> While the report of a commissioner in
> chancery does not carry the weight of a
> jury's verdict, it should be sustained
> unless the trial court concludes that the
> commissioner's findings are not supported by
> the evidence.  This rule applies with
> particular force to a commissioner's
> findings of fact based upon evidence taken
> in his presence . . . .  [W]here the
> chancellor has disapproved the
> commissioner's findings, this Court must
> review the evidence and ascertain whether,
> under a correct application of the law, the
> evidence supports the findings of the
> commissioner or the conclusions of the trial
> court.  Even where the commissioner's
> findings of fact have been disapproved, an
> appellate court must give due regard to the
> commissioner's ability, not shared by the
> chancellor, to see, hear, and evaluate the
> witnesses at first hand.

Id. at 576-77, 318 S.E.2d at 296-97.  See Jones v. Jones, 26 Va.

App. 689, 694, 496 S.E.2d 150, 153 (1998).

### Judy's Attorney and Expert Witness Fees

In the course of litigating this matter, Judy incurred

litigation expenses exceeding $290,000, including nearly

$170,000 in attorneys' fees and more than $65,000 in

accountants' fees.  The commissioner valued Judy's separate

estate at over $6,000,000.[10]  Pettus' separate property was

valued at just under $2,000,000.  Noting that both sides had

---

[10] Pettus does not challenge on appeal the classification of
those assets included in Judy's separate estate.

incurred substantial litigation-related expenses and that an award of legal fees was not necessary to enable Judy to carry on this suit, the commissioner recommended that Judy's fee request be denied.  The trial court accepted this recommendation.

"An award of attorney's fees to a party in a divorce suit is a matter for the exercise of the trial court's sound discretion after consideration of the circumstances and equities of the entire case."  Davis v. Davis, 8 Va. App. 12, 17, 377 S.E.2d 640, 643 (1989).  Factors to be considered include the respective financial positions of the spouses and their degree of fault in precipitating the end of the marriage.  See Theismann v. Theismann, 22 Va. App. 557, 574, 471 S.E.2d 809, 817 (holding that husband's "clearly superior financial position" and the fact that his infidelity caused the break-up of the marriage justified an award of attorney's fees to wife), aff'd upon reh'g en banc, 23 Va. App. 697, 479 S.E.2d 534 (1996).

The record reflects that Judy's separate estate vastly exceeds Pettus' separate estate, and she has adequate financial resources to pay for her own litigation expenses.  "The facts of this case evince no unusual circumstances such as bad faith or gross disparity of financial resources which would warrant disturbance of the trial court's judgment."  Brooks v. Brooks, 27 Va. App. 314, 319, 498 S.E.2d 461, 464 (1998).  Accordingly,

we affirm the trial court's decision to deny Judy's request for her fees and costs.

## Conclusion

For the foregoing reasons, we hold that the trial court did not err when it found that the 220 shares of Overnite Transportation stock Pettus purchased during the marriage were his separate property. We hold, however, that the trial court erred in finding that Dow-Gil and VCI were marital property. Accordingly, we remand this matter to the trial court to re-classify in a manner consistent with this opinion all assets whose original classification turned, in whole or in part, on the trial court's classification of Dow-Gil and VCI as marital property. We likewise hold that the trial court erred in classifying the Stone note. Upon re-classifying the parties' assets, the trial court shall, upon complying with the statutory mandate of Code § 20-107.3(E), divide the marital property in the exercise of its sound discretion. Because the re-classification of the parties' property will result in a substantially lower amount of marital property, we need not address the propriety of the trial court's initial proportional division of the marital estate. Finally, we affirm the trial court's denial of Judy's request for fees and costs.

Affirmed in part,
reversed in part,
and remanded.

- 24 -