COURT OF APPEALS OF VIRGINIA

Present: Judges Decker, Malveaux and Senior Judge Annunziata

AMBROSIA de JESUS MARTINEZ, S/K/A
 AMBROSIA MARTINEZ de JESUS

v.      Record No. 0090-18-3

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

PASCUAL MARTINEZ FLORES, S/K/A
 PASCUAL MARTINEZ-FLORES

v.      Record No. 0097-18-3

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

PASCUAL MARTINEZ FLORES, S/K/A
 PASCUAL MARTINEZ-FLORES                          MEMORANDUM OPINION[*]
                                                          PER CURIAM
v.      Record No. 0578-18-3                           OCTOBER 16, 2018

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

PASCUAL MARTINEZ FLORES, S/K/A
 PASCUAL MARTINEZ-FLORES

v.      Record No. 0579-18-3

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

PASCUAL MARTINEZ FLORES, S/K/A
 PASCUAL MARTINEZ-FLORES

v.      Record No. 0580-18-3

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Bruce D. Albertson, Judge

(Tania L. Perez Rodriguez; John Elledge & Associates, on brief), for
appellant Ambrosia de Jesus Martinez, s/k/a Ambrosia Martinez de
Jesus.  Appellant submitting on brief.

(Roland M. L. Santos, on brief), for appellant Pascual Martinez
Flores, s/k/a Pascual Martinez-Flores.  Appellant submitting on
brief.

(Kim Van Horn Gutterman, Assistant County Attorney; Sherwin
John Jacobs, Guardian *ad litem* for the minor children, on briefs), for
appellee.  Appellee and Guardian *ad litem* submitting on briefs.

Ambrosia de Jesus Martinez, s/k/a Ambrosia Martinez de Jesus, (mother) and Pascual

Martinez Flores, s/k/a Pascual Martinez-Flores, (father) are appealing the orders terminating

their parental rights and approving the foster care goal of adoption.  Mother argues that the

circuit court erred in finding that the Harrisonburg Rockingham Social Services District (the

Department) "presented clear and convincing evidence that terminating mother's parental rights

was appropriate and in [the children's] best interest pursuant to Va. Code Ann. § 16.1-283."

Father argues that the circuit court erred in finding that he "did not remedy substantially the

conditions which led to the removal of the children under Va. Code Ann. § 16.1-283(C) when

the evidence revealed that [father and mother] completed most of the tasks assigned to them

pursuant to the foster care plan."  Upon reviewing the record and briefs of the parties, we conclude

that the circuit court did not err.  Accordingly, we affirm the decision of the circuit court.

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most

favorable to the prevailing party below, in this case the Department.'"  Farrell v. Warren Cty.

Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v.

Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

Mother and father are the biological parents to E. and A., who are the subject of this appeal, as well as K. and C.[1] Mother and father are from Oaxaca, Mexico. Their primary language is an indigenous dialect, Triqui; however, they also can communicate in Spanish.

From April 2010 until January 2016, the Department and neighboring Shenandoah County Department of Social Services (Shenandoah County DSS) received a total of seventeen complaints regarding the parents and the children.[2] The complaints included allegations of physical abuse, inadequate shelter, lack of food, hygiene problems, lack of supervision, bizarre discipline, and medical neglect. The physical abuse and bizarre discipline complaints concerned E. and involved incidents in which E. had bruises, scratches, and a black eye.[3] One of the complaints, in June 2011, resulted in father pleading guilty to assault and battery against E. Over the years, the Department had entered into safety plans with the family, and father had agreed not to use corporal punishment. The safety plans were written in "very simple Spanish," so the parents could understand. The Department offered information to the family about the food pantry, English classes, and the PEAS parenting class. The family received services for C., including a home health care nurse and a hospice nurse. However, the home health aide stopped coming to the house after father had locked her inside in January 2013, and the parents later stopped allowing the hospice nurse into the house. The Shenandoah County DSS offered services to E., such as counseling, medication management, case management, therapeutic day treatment, and mentoring. The parents declined parenting

---

[1] K. is the oldest child and lives with her grandmother in Mexico. C. was born with Niemann-Pick disease, Type C, and died, at the age of three, in 2014.

[2] In 2010, the family lived in Rockingham County, and by the time of the February 9, 2012 complaint, they had moved to Shenandoah County. They moved back to Rockingham County sometime between December 16, 2013 and July 28, 2015, when the Department received the next complaint.

[3] The hygiene and medical neglect complaints concerned C.

education classes, and the Department was "unclear" as to what services the Shenandoah County DSS offered to the parents to address the physical abuse issues.

On January 7, 2016, the Department received the seventeenth complaint, which alleged that E. was being physical abused. E. reported that "a big fat guy recently moved in" and that E. had to sleep on the floor. E. stated that "he was sleeping and the big fat guy came and ripped the blanket off of him and hit him with a belt on his legs and near his groin area." E. said that his mother became angry, told him to get in the shower, and hit him repeatedly with a shoe. Next, E. said that the "big fat guy turned the water all the way up and put him in the shower with his clothes on," and mother was angry at E. for using all of the hot water. On January 14, 2016, E. refused to speak with the social worker because he was worried that his parents would be angry if he talked with her. On February 17, 2016, the social worker met with mother and father, and father reported that A. was good and listened, unlike E. Father reported that E. was "not right in the head," and father did not know "what to do because he [could not] hit him [E.] anymore because the agency had indicated he could not." On February 18, 2016, father told the principal at E.'s school that E. was a liar and not to call social services every time E. says something. On March 15, 2016, the Department filed a petition for an emergency removal of E. and A. At the time of the removal, E. was ten years old, and A. was three years old.

On March 15, 2016, the Harrisonburg Rockingham Juvenile and Domestic Relations District Court (the JDR court) entered emergency removal orders for E. and A. The JDR court adjudicated that E. and A. were abused or neglected and entered dispositional orders on August 10, 2016. The parties stipulated to the facts for the abuse and neglect and how the children came into foster care.

Initially, E. and A. were placed in the same foster home, but in order to better address his behavioral and emotional needs, the Department moved E. to Childhelp, a residential treatment

center, on April 19, 2016. In February 2017, E. was discharged from Childhelp and placed in a different foster home.

While the children were in foster care, the Department required mother and father to "accept their role in the removal of the children and acknowledge the need for increasing their parental capacity." Mother and father also had to maintain stable housing and employment. Mother and father needed to "demonstrate the ability to provide a home that is safe, stable, and free from physical abuse" and show that they understood age-appropriate disciplinary techniques. The Department offered weekly supervised visitation and referred mother and father to individual counseling, parenting classes, and a parent mentor.

The parents attended the parenting classes, which were taught in Spanish. Father participated in individual counseling. His counselor reported that father asked questions and was engaged, but father did not believe that he needed therapy. Although mother and father initially went to counseling, they stopped going in early 2017. A Spanish-speaking parent mentor was assigned to work with mother and father from August 2016 through May 2017. The parents consistently met with the parent mentor and discussed cultural differences and appropriate parenting in the United States versus Mexico. The parent mentor also accompanied them to their visits with A. and discussed appropriate behavior.

Beginning with the removal and continuing throughout the case, the parents denied abusing E. or A. and believed that the children were removed because of E. and his behaviors. Mother and father stated that E. lied about the abuse and that E. was a "bad child." The only time that mother and father admitted that one of them abused A. or E. was when father was arrested for assault and battery against E.

Neither parent showed an understanding of mental illness. Father told the social worker that E. should not be taking any medication, and father told E. to stop taking his medication because it

- 5 -

made him "more crazy." Father also asked the social worker to give E. a blood test, so that they can determine how to "fix" his brain. Father told a Childhelp therapist that E. needed "more intensive treatment or alteration to his brain." Mother and father told E. that "the only thing [he] can do to improve himself is pray." Mother and father denied that E.'s behavior could be related to abuse he sustained.

On March 7, 2017, the Department filed petitions to terminate mother and father's parental rights to E. and A. On April 19, 2017, the JDR court terminated mother and father's parental rights and approved the goals of adoption; mother and father appealed the JDR court's rulings to the circuit court.

On January 11, 2018, the parties appeared before the circuit court. At the beginning of the trial, mother and father stated that they did not contest the facts as to how the children came into foster care, and the Department stipulated that the parents complied with the majority of the services. The Department explained that the main issue was whether mother and father learned from the services provided and applied that knowledge appropriately. Mother and father argued that they did not understand everything that was asked of them because services were provided in Spanish, which was not their primary language.

The Department proffered that E. has been in the same foster home since late February 2017, and it is a potential adoptive placement. The Department presented evidence that A. has been in the same foster home since he entered foster care in March 2016. The foster father testified that initially both A. and E. were placed together in the home. The foster father said that E. was "very difficult[,] . . . very angry, defiant, moody, . . . [and] dangerous." Due to concerns about their safety, the foster parents informed the Department that they were not equipped to handle E. and his needs, so the Department removed E. from their home. When A. first arrived, he did not speak English and used "foul language." Now, however, A. speaks and understands English. The foster

father testified that A. was thriving and was "kind of a regular kid now." The foster father indicated that he and his wife would like to adopt A.

Since A. entered foster care, he has seen a psychologist, Dr. Ronda Weber. Dr. Weber is fluent in Spanish, and initially, she tried to speak with A. in Spanish. However, A. was upset that she tried talking with him in Spanish, so they spoke English. Dr. Weber testified that initially A. was "hyper vigilant at a level that would not be typical for a child his age." Dr. Weber diagnosed A. with post-traumatic stress disorder. A. had a preoccupation with food and being fed, and he displayed fearfulness and had nightmares. Dr. Weber testified that in the past year and a half, A. has become "less hyper vigilant" and is not as fearful, especially when he stopped visiting with mother and father. Dr. Weber commented that A. did not want to see mother and father and did not express any loss or grief concerning them. Dr. Weber even noted that A. showed more bonding behavior with his foster mother after living with her for four months than he ever showed toward mother. Dr. Weber opined that contact between A. and mother and father would cause A. to "regress in his improvement" and "be very confused and feel more insecure about his current situation."

The social worker testified about some of the visits between mother, father, A., and E. On January 24, 2017, the parents were visiting with A. and playing a game. The social worker noticed that A. spoke with her and the parent mentor, but not mother and father "until the last minute." The social worker stated that the parent mentor spoke in Spanish, but A. responded in English. In late February 2017, E. started visiting with A., mother, and father at the Department's office. A. and E. mainly spoke in English, but occasionally spoke in Spanish. The social worker testified about a visit on March 21, 2017, when E. had to leave early, and A. then stopped responding to mother and father. The social worker commented that A. acted differently during the visitations than at his

foster home because when A. was in the foster home, he talked non-stop and was very playful and sociable.

After the JDR court hearing on April 19, 2017, the Department spoke with mother and father and instructed them not to speak with the children about the court matters. On May 23, 2017, mother and father visited with E. and A., and due to the parents' actions during the visit, this was the last visit between the parents and the children. The social worker testified that while mother, father, E., and A. were eating, mother told E. that "he wasn't going to get to eat food like this anymore because he wasn't Mexican anymore and he was American now." Mother showed him a photograph of C. and told E. that "this was the baby who died and now it's like you're dying too." Both mother and father told E. that "they were suffering because of [E.]." E. cried. The social worker asked mother and father to "stop talking about that" and to enjoy the time that they had with the children. Father started to argue with the social worker, and mother continued to tell E. that he was going to "have another mom and said that she was going to have to sell all of his things." The social worker again asked them to stop, and father told her that they could say whatever they wanted to their children. The social worker asked both parents to leave the visitation room, and reminded them that they were not to discuss the court actions and foster care with E. and A. When father started to argue with her, the social worker told them that they could continue to discuss it, but that they would lose what visitation time they had left. Mother and father went back into the visitation room.

Dr. Weber also witnessed the visitation on May 23, 2017, and corroborated the social worker's account of what had transpired. Dr. Weber testified that once mother and father left the room, E. stopped crying and started playing with A. Dr. Weber said that the children talked and played as if nothing had happened.

The Department also presented evidence about its monthly meetings with mother and father, beginning in February 2017. Mother and father continued to believe that the children were placed in foster care because of the "one time that [father] had abused [E.] and all of the lies that had happened after that." Mother and father repeatedly said that E. had to change because he was "a liar" and "crazy." At no point did the parents show any understanding of how their actions affected the children. Instead, the parents focused on how having the children in foster care affected them. For example, mother said that it was difficult not having E. at home because she relied on him to communicate in English with other people.

Father admitted to speaking with the social worker prior to the May 23, 2017 visit about what to say and not say to the children. However, father testified that he did not understand everything that the social worker told him because he did not speak Spanish well. Father explained that he was "playing" when he told E. that he was no longer going to live with them and no longer eat Mexican food. He said that he did not intend to make E. cry.

Mother testified that she started learning Spanish in Mexico and continued to learn Spanish once she came to the United States; however, her primary language is Triqui. Mother explained that she did not understand all of the words in the Spanish-speaking parenting classes. Mother, however, admitted that she spoke to E. and A. in Spanish, not Triqui.

After hearing the evidence and arguments, the circuit court issued its ruling and entered orders terminating mother and father's parental rights and approving the goal of adoption. These appeals followed.

## ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558, 811 S.E.2d

835, 840-41 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).  "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it."  Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)).

Both mother and father argue that the evidence was insufficient to support a termination of their parental rights.  Mother contends that she complied with the Department's requirements and that "her failure to adequately express that she had internalized the services to [the Department's] satisfaction was due to a language barrier."  Likewise, father asserts that he completed most of the Department's requirements, but the fact that the parents speak Triqui "greatly handicaps their ability to progress in the counseling that the parents were provided, primarily because their Spanish is limited and most of the counseling was in Spanish."

The circuit court made a factual finding that "there is not a language issue when it came to the parents' performance with the services provided."  The circuit court held that mother and father "were able to converse with various service providers" and noted that "they would respond appropriately and on topic which shows their understanding."  The circuit court further found that there was "no evidence of a cultural issue that [was] raised by the father."

"We give 'great deference' to the trial court's factual findings and view the facts in the light most favorable to the prevailing party below."  Andrews v. Creacey, 56 Va. App. 606, 619, 696 S.E.2d 218, 224 (2010) (quoting Blackson v. Blackson, 40 Va. App. 507, 517, 579 S.E.2d 704, 709 (2003)).  "On appeal, we will not reverse findings of fact 'unless plainly wrong.'"  Budnick v. Budnick, 42 Va. App. 823, 834, 595 S.E.2d 50, 55 (2004) (quoting Gilman v. Gilman, 32 Va. App. 104, 115, 526 S.E.2d 763, 768-69 (2000)).

Contrary to the parents' arguments, the evidence supports the circuit court's finding that language was not a barrier for mother and father. The Department provided the parents with Spanish-speaking social workers and a Spanish-speaking parent mentor. The Department referred them to a Spanish parenting class. The parents did not inform the social workers that they did not understand, and in fact, conversed in Spanish with the Department and the children.

Furthermore, the circuit court did not err in terminating mother and father's parental rights and finding that termination of parental rights was in the children's best interests. The circuit court terminated mother and father's parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." Id. (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

Although mother and father complied with most of the Department's requirements, they did not apply what they had been taught or show an understanding of how their actions affected the children. The circuit court held, "When it comes to the issue of good cause in the termination,

- 11 -

again, there is no evidence that cultural or language issues rose to that level of good cause, nor as to the parents' behavior." Despite all of the services, including the parenting classes and the parent mentor, mother and father never comprehended their role in the placement of the children in foster care. In February 2017, mother told the social worker that the children were in foster care because "of the one time that [father] had abused [E.] and all of the lies that had happened after that." Mother and father repeatedly focused on how the placement of the children had affected them, as opposed to how their actions affected the children. At the last visitation in May 2017, mother and father told the children that they were no longer Mexican and would not eat Mexican food because they had new families. Mother told E. that it was like he was dying and that she was going to sell all of his clothes and toys. Mother and father testified that they did not realize that their statements would upset E. Therefore, in spite of all of the services provided to the parents over the years, mother and father had not determined how to apply what they learned to interacting with their children.

At the time of the circuit court hearing, E. and A. had been in foster care for almost two years. The Department presented evidence that A. was doing well in foster care and in an adoptive placement. E. initially had displayed behavioral issues, but after receiving treatment at Childhelp, he was doing well in a foster home, which was a possible adoptive placement. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322, 746 S.E.2d 509, 522 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)).

The evidence supports the circuit court's finding that the parents had been "unwilling or unable within a reasonable period of time not to exceed twelve months from the date the [children were] placed in foster care to remedy substantially the conditions which led to or required

- 12 -

continuation of the child[ren]'s foster care placement." The circuit court did not err in terminating mother and father's parental rights pursuant to Code § 16.1-283(C)(2) and approving the goal of adoption for E. and A.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

<u>Affirmed.</u>