DECISION
This is an appeal by plaintiff-appellant, Cristi Lynne Fox, from a judgment entry/decree of divorce entered by the Franklin County Court of Common Pleas, Division of Domestic Relations, distributing the parties' property pursuant to the terms of a prenuptial agreement. Defendant-appellee, Lawrence John Fox, has filed a cross-appeal.
On June 22, 1999, plaintiff filed a complaint for divorce against defendant. Defendant filed an answer and counterclaim on July 19, 1999. The trial court conducted a hearing beginning on September 26, 2000. On December 20, 2000, the trial court filed a judgment entry/decree of divorce. The trial court's decision and the record indicate the following facts.
Plaintiff and defendant were married in October 1992, and no children were born as issue of the marriage. The parties first started dating in 1985 or 1986. At the time, defendant was president of a software company, Micro Manufacturing Systems, later named Symix Systems, Inc. ("Symix"). Defendant's annual income was approximately $75,000 to $100,000 when the parties began dating, and his income was approximately $300,000 when they were married in 1992.
In 1990, plaintiff moved to Chicago where she obtained employment as director of national accounts for Justrite Manufacturing Company ("Justrite"), a hazardous waste containment manufacturer. Although defendant remained in the Columbus area, the parties continued to date, and in 1991 defendant proposed marriage. Defendant also discussed with plaintiff his desire for a prenuptial agreement. An agreement was prepared and subsequently signed by the parties on October 13, 1992, the same month they were married. The negotiating process took several months, and the trial court found that experienced and competent counsel represented both parties. In signing the agreement, plaintiff eventually chose one of two proposed division of assets. Specifically, under paragraph "SECOND" of the agreement, "in lieu of any distributive award or property settlement to which [she] might otherwise be entitled should the parties' marriage end in divorce," plaintiff would receive $1,000,000 in Symix stock at the time of the marriage, as well as an undivided one-half interest in defendant's residence.
In her position with Justrite, plaintiff earned approximately $80,000 in 1991 and approximately $90,000 when she left her position with the company less than three years later. For a period of time after the marriage, plaintiff continued commuting to Chicago regarding her employment. According to plaintiff, defendant implied at the time that she should forego her career so they could go to Florida for months at a time without having to worry about her work schedule.
The trial court noted that the parties lived an extravagant lifestyle, traveling to destinations including the Caribbean, Singapore, Tokyo, and Paris, as well as frequent trips to Florida and numerous ski vacations in the west. The couple also lived in an expensive home, owned expensive jewelry and artwork, and drove luxury automobiles. Plaintiff spent lavishly on her wardrobe and had extensive costs involved with boarding a horse, while defendant belonged to numerous exclusive golf and country clubs.
The primary issue before the trial court was the interpretation of the parties' prenuptial agreement. Upon signing the agreement, plaintiff received shares of Symix stock valued at one million dollars. Plaintiff also obtained a one-half interest in the marital home and any increase in equity or value of the home, located on Abbotsford Green in the "Loch Lomond" residential community. Defendant had owned the Abbotsford Green residence for four or five years prior to marrying plaintiff. The trial court found the increase in value of the present marital home (located on Olentangy River Road) to be at least $565,000; the court noted that defendant did not contest that plaintiff was entitled to one-half of the equity in the house, as well as her horse, trailer, truck, jewelry, Rolex watch and her clothing, costing over $150,000.
During the marriage, a beach house in Florida was purchased for $1,400,000, which the court determined was acquired through a personal loan taken out by defendant alone, in which he pledged his separate property of Symix stock as collateral. The court noted that defendant pledged a total of $2,800,000 worth of stock and, at the time of the hearing, defendant had paid over $200,000 in interest on the property. Plaintiff did not personally sign on the note.
Defendant has an interest in a new company, Alkon, and he owns several million shares of Alkon stock. Shortly before the marriage, defendant signed a split-dollar insurance agreement with Symix, and the company made premium payments on the policy during the marriage. Defendant also obtained stock options during the marriage through Symix that have not been exercised.
At the time of the marriage, plaintiff had her own income and her own checking account. Plaintiff stated that she used her income to pay for her apartment in Chicago. When she quit her employment in Chicago, plaintiff and defendant opened a joint checking account with defendant's paycheck being deposited into the account and an additional $10,000 per month going into the account from securities held by The Ohio Company. The parties' monthly mortgage payment was $9,500. Plaintiff essentially handled the checking account and she was the only one who carried the checks. She would spend the money and tell defendant how much money needed to be placed into the account.
The parties subsequently closed on a larger house in a small, gated community, located on Olentangy River Road. The parties had expensive landscaping done to the property and plaintiff hired a designer who helped her obtain custom designed furniture from Italy and other locations. One of the sofas in the house was purchased for $40,000.
The trial court found that the parties furnished the Florida beach house primarily by means of a two and one-half hour shopping spree at one of Florida's finest furniture stores. The beach house has increased in value in slightly less than three years by the amount of $750,000 due to the fact that overall beachfront property in that area has drastically increased. There was conflicting testimony regarding the beach house property. Defendant testified that plaintiff did not enjoy Florida, and that she did not put much effort in shopping for the furniture for that house, while plaintiff maintained that she expended a significant amount of time furnishing the house. The trial court found defendant's testimony to be more credible on this issue.
Defendant claimed that when he proposed buying the new beach house in Florida, plaintiff demanded that they also again obtain an apartment in Chicago so that she could visit her friends in that city. Defendant agreed to do so, and they spent approximately $10,000 to furnish the Chicago apartment.
In January or February 1998, defendant learned that plaintiff was seeing a married man, Jerry Suqi, who lived in the Chicago area. Defendant believed that plaintiff's relationship with Suqi might have begun much earlier, around June 1997.
Plaintiff filed for divorce on June 22, 1999, claiming she was forced to file because she was unemployed and defendant had closed their joint checking account. By order of a magistrate of the trial court, plaintiff was awarded temporary spousal support for one year with an automatic termination date, pending the divorce proceedings.
The trial court's judgment entry/decree of divorce addressed the terms of the prenuptial agreement, including the disposition of various assets and the issue of spousal support under the agreement. In its decision, the court found that the date plaintiff filed for divorce, June 22, 1999, constituted the de facto termination date of the marriage. The court awarded the marital home on Olentangy River Road to defendant and ordered defendant to pay plaintiff the sum of $282,706 as her equity interest in the marital residence (derived from dividing the equity in the house by two). The court awarded plaintiff $30,000 as the value for some of the furnishings in the marital home. The court found that a 5.004 acre-tract and a gatehouse office located adjacent to the marital home were the separate property of defendant, as well as the Florida beach house. The court awarded plaintiff two residences in Chicago based on the court's finding that these properties were purchased with plaintiff's separate assets. The court also awarded defendant the entire interest in the Alkon stock, as well as a New England Life Insurance policy, a 401(K) account and Symix stock options. The court found that defendant was solely responsible for a $25,000 charity pledge. Further, the court found that spousal support for plaintiff was not necessary and therefore denied such support under the terms of the prenuptial agreement.
On appeal, plaintiff sets forth the following eight assignments of error for review:
ASSIGNMENT OF ERROR NO. 1
 THE TRIAL COURT ABUSED ITS DISCRETION AND HELD AGAINST THE WEIGHT OF THE EVIDENCE BY ITS MISCONSTRUCTION AND MISINTERPRETATION OF THE PARTIES' PRENUPTIAL AGREEMENT; AND FURTHER, BY ITS MISAPPLICATION OF THE PARTIES' PRENUPTUAL AGREEMENT TO THE CLASSIFICATION AND DISTRI-BUTION OF THE PROPERTY OF THE PARTIES.
ASSIGNMENT OF ERROR NO. 2
 THE TRIAL COURT ABUSED ITS DISCRETION AND HELD AGAINST THE WEIGHT OF THE EVIDENCE IN ITS CLASSIFICATIONS OF SEPARATE AND MARITAL PRO-PERTY, AS WELL AS ITS DIVISION OF THESE ASSETS; AND FURTHER FAILED TO AWARD APPELLANT A CORRECT AND/OR EQUITABLE DIVISION OF THE PARTIES' ASSETS UNDER EITHER OHIO LAW OR THE PARTIES PRENUPTIAL AGREEMENT.
ASSIGNMENT OF ERROR NO. 3
 THE TRIAL COURT ABUSED ITS DISCRETION AND HELD AGAINST THE WEIGHT OF THE EVIDENCE IN ITS VALUATION OF SEPARATE AND MARITAL PROPERTY; AND, IMPROPERLY FAILED TO VALUE ALL OF THE PROPERTY.
ASSIGNMENT OF ERROR NO. 4
 THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED WHEN IT REFUSED TO ADMIT TESTIMONY OF THE APPELLANT AS TO THE MEANING APPELLANT GAVE TO THE TERM "FINANCIAL CONTRIBUTION," AND FURTHER ERRED IN HAVING SUSTAINED THE APPELLEE'S OBJECTION TO HER TESTIMONY.
ASSIGNMENT OF ERROR NO. 5
 THE TRIAL COURT ABUSED ITS DISCRETION AND HELD AGAINST THE WEIGHT OF THE EVIDENCE WHEN IT FAILED TO AWARD INTEREST AND/OR APPRECIATION TO THE APPELLANT ON THOSE ASSETS AND/OR DISTRIBUTIVE AWARD SHE WAS AWARDED.
ASSIGNMENT OF ERROR NO. 6
 THE TRIAL COURT ABUSED ITS DISCRETION AND HELD AGAINST THE WEIGHT OF THE EVIDENCE WHEN IT INCORRECTLY VALUED ASSETS AS OF THE DATE THE DIVORCE COMPLAINT WAS FILED, OR AS OF ANY DATE OTHER THAN THE DATE OF THE TRIAL.
ASSIGNMENT OF ERROR NO. 7
 THE TRIAL COURT ABUSED ITS DISCRETION AND HELD AGAINST THE WEIGHT OF THE EVIDENCE WHEN IT FAILED TO AWARD SPOUSAL SUPPORT TO THE APPELLANT.
ASSIGNMENT OF ERROR NO. 8
 THE TRIAL COURT ABUSED ITS DISCRETION AND HELD AGAINST THE WEIGHT OF THE EVIDENCE WHEN IT TOOK THE APPELLANT'S DOG "JORDAN" AWAY FROM HER AND AWARDED "JORDAN" TO THE APPELLEE.
Defendant has filed a cross-appeal, and sets forth the following two assignments of error for review:
 I. THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW IN AWARDING PLAINTIFF-/APPELLANT/CROSS-APPELLEE $30,000 AS A PORTION OF THE VALUE OF THE PARTIES' FURNITURE AND ACCOUTREMENTS LOCATED AT THE PARTIES' MARITAL RESIDENCE.
 II. THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW IN FAILING TO OBLIGATE PLAINTIFF/APPELLANT/CROSS-APPELLEE TO ONE-HALF OF THE PLEDGE TO BIG BROTHERS/BIG SISTERS.
Plaintiff's first, second, third and fourth assignments of error are interrelated and will be considered together. Under these assignments of error, plaintiff asserts that the trial court failed to properly construe, interpret and apply the parties' prenuptial agreement, that the court erred in its classification and valuation of separate and marital property, and that the court erred in refusing to admit plaintiff's testimony as to the meaning of the term "financial contribution" under the prenuptial agreement.
In Ohio, "public policy allows the enforcement of prenuptial agreements." Fletcher v. Fletcher (1994), 68 Ohio St.3d 464, 466. A prenuptial agreement is "a contract entered into between a man and a woman in contemplation, and in consideration, of their future marriage whereby the property rights and economic interests of either the prospective wife or husband, or both, are determined and set forth in such instrument." Gross v. Gross (1984), 11 Ohio St.3d 99, 102. Under Ohio law, parties to a prenuptial agreement are permitted "to cut one another off entirely from any participation in the other's estate." In re the Estate of Armstrong (Mar. 20, 1997), Hocking App. No. 96 CA 3, unreported, citing Hook v. Hook (1982), 69 Ohio St.2d 234, 235. Similarly, "the prospective wife or husband waives any particular right arising out of the marriage contract, including statutory rights, `where the agreement by its clear wording shows that such a result was intended.'" Armstrong, supra, quoting Troha v. Sneller (1959), 169 Ohio St. 397, syllabus.
In Gross, supra, at paragraph two of the syllabus, the court held that prenuptial agreements are valid and enforceable under the following circumstances:
 * * * (1) [I]f they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce.
In the present case, plaintiff does not challenge the above conditions pertaining to the validity and enforceability of the agreement. Rather, plaintiff contends that the trial court erred in its interpretation of the terms of the agreement in determining the distribution of various assets, including a 401(K) plan, a life insurance policy, Symix stock options, Alkon stock, property located adjacent to the marital residence and a beach house in Florida.
As noted under the facts, the parties entered into the agreement at issue on October 14, 1992. For purposes of the instant appeal, the relevant portions of the agreement provide as follows:
 WHEREAS, both Larry and Cristi are entering into this marriage without the expectation of acquiring a share of the assets, income or earnings of the other party to the marriage, it being the intention of both Larry and Cristi that neither shall have any right, title, interest or claim in or to the separate property of the other either during their marriage or upon its termination or upon the death of the other; and
* * *
 NOW, THEREFORE, in consideration of the promises of the parties to marry, and of the solemnization of such promised marriage, and of the mutual covenants, promises and agreements herein made and contained, the parties * * * do hereby covenant, promise and agree as follows:
 FIRST: (A) Except as specifically provided in paragraph SECOND, each party hereto shall own, in his or her own right during their marriage, all of the property which he or she owned prior to the marriage, all of the income, appreciation, accretions or other benefits accruing upon his or her property during the marriage whether such income and appreciation is acquired passively or is due to the labor, monetary, or in-kind contribution of either spouse or both spouses during the marriage and all gifts, devises or inheritances made to him or her individually (hereinafter referred to as "Separate Pro-perty"). The Separate Property owned by the individual parties prior to the marriage includes all of the property described in Exhibits A and B hereof, which exhibits are herein incorporated by reference with the same full force and effect as though fully set forth herein.
* * *
 (C) All property acquired jointly by the parties during the course of their marriage as well as the income, appreciation, accretions or other benefits accruing to this jointly acquired property (hereinafter referred to as "Joint Property") belongs to both parties or to the survivor. The term "Joint Property" is herein defined and intended by the parties to exclude all income and appreciation in or to "Separate Property" (as defined herein) even if said income and/or appreciation may be due to the labor, monetary, or in-kind contribution of either spouse or both spouses during the marriage.
 (D) In the event the marriage of the parties should end while both parties are living as a result of a divorce, legal separation, dissolution or other legal proceeding, each party will retain his or her Separate Property (as defined herein) and all income and appreciation on that Separate Property, whether such income and appreciation is acquired passively or is due to the labor, monetary, or in-kind contribution of each spouse or both spouses during the marriage. In entering this AGREEMENT, the parties specifically recognize the presumptions and definitions contained in Ohio Revised Code § 3105.171 and freely, knowingly and voluntarily seek to create a prenuptial agreement which supercedes the pre-sumptions and definitions contained therein.
 (E) In the event that the marriage of the parties should end while both parties are living as a result of a divorce, legal separation, dissolution or other legal proceeding, the parties agree to divide, in shares equal to their financial contribution thereto, the Joint Property which they acquire jointly during the course of their marriage as well as the income, appreciation, accretions or other benefits accruing to that property. Additionally, and notwithstanding Paragraph FIRST (D), the parties principal residence (as defined by Internal Revenue Service Regulations) shall be deemed to be Joint Property to which the parties contributed equally and, should the parties' marriage end as set forth in this subparagraph, shall be divided equally regardless of the financial contribution thereto.
 SECOND: In recognition of Ohio Revised Code § 3105.171
and in lieu of any distributive award or property settlement to which Cristi might otherwise become entitled should the parties' marriage end in divorce or dissolution, Cristi hereby agrees to accept from Larry and Larry agrees to transfer from his Separate Property (as defined herein): (1) shares of Symix Corp. stock which shares had a total value, based on the closing price on the NASDAQ/NMS on October 16, 1992, of $1,000,000. These shares shall be transferred from Larry to Cristi within thirty (30) days after the marriage of the parties. Thereafter, said shares of stock will be recognized as Cristi's Separate Property which she shall own, control and retain as her own * * * and (2) an undivided one-half interest in his residence real estate known as 1590 Abbotsford Green Drive, Delaware County, Ohio, which real estate shall thereafter become Joint Property owned by the parties jointly as tenants in common with right of survivorship and disposed of pursuant to paragraphs FIRST (C) or FIRST (E).
* * *
 SIXTH: Except as specifically provided in this AGREEMENT, Larry and Cristi hereby mutually release and waive any and all right, title and interest accruing by operation of law, or under any statute now or hereafter to be in force, or otherwise, either under the laws of the State of Ohio (which are to govern this AGREEMENT) or of any other state, to participate in the separate estates and Separate Property of each other, whether such property be real or personal and wheresoever located, and whether acquired before or subsequent to their marriage, or before or subsequent to the date hereof, including specifically, but without limitation, any right or claim that he or she may have pursuant to the provisions of:
* * *
 (f) Ohio Revised Code § 3105.171 to receive a distributive award or spousal support and to share in some circumstances in the income and appreciation on the Separate Property of the other.
as such sections now exist or hereafter may be amended.
* * *
 ELEVENTH: Both parties hereby jointly and severally acknowledge their complete understanding of such legal and other effects of this AGREEMENT; each acknowledges his or her understanding that he or she is giving up and waiving rights which might well have great value in exchange for the provisions of this AGREEMENT and each does so freely and willingly, both parties understanding that they are waiving their statutory rights to elect against the Last Will and Testament of the other, their statutory right to an intestate share in the estate of the deceased spouse, their statutory right in some circumstances to share in income and appreciation on the Separate Property of the other, and any statutory right they may have in the Separate or conjugal property and earnings of the other.
Plaintiff initially argues that the trial court erred by elevating a recital clause in the agreement to a controlling provision. Specifically, plaintiff challenges the trial court's interpretation of the "WHEREAS" clause cited above, which states in part that the parties are "entering into this marriage without the expectation of acquiring a share of the assets, income or earnings of the other party to the marriage," and that the intention of both parties is that "neither shall have any right, title, interest or claim in or to the separate property of the other either during their marriage or upon its termination." In addressing the above clause in its decision, the trial court held in part that, "[a]lthough the above sentence is lengthy and awkward, it does state that neither party expects to acquire a share of the income or earnings in addition to separating out premarital assets."
Plaintiff asserts that the "WHEREAS" clause at issue was merely a recital, and that it is not a controlling provision of the agreement. In support, plaintiff cites a number of cases from other jurisdictions for the proposition that a contract's recital is not part of the terms of a contract and is used only to understand the intent of the parties when the actual contract terms are ambiguous. See, e.g., Grynberg v. FERC (C.A.D.C. 1995), 71 F.3d 413, 416 ("a Whereas clause, while sometimes useful as an aid to interpretation, `cannot create any right beyond those arising from the operative terms of the document'"); Engineered Data Products, Inc. v. Nova Office Furniture, Inc. (D.C.Col. 1994),849 F. Supp. 1412, 1417 ("Recitals and titles, not being strictly part of the contract, cannot extend contractual stipulations, though they may have material influence on the construction of the instrument and the determination of parties' intent"); McKinnon v. Baker (Neb. 1985),370 N.W.2d 492, 494 (recitals have limited value in construction of a contract; they are generally background statements and do not ordinarily form any part of the real agreement, but may be of value if agreement is ambiguous); Blankenship v. Kiehne (Mo.App. 1949), 225 S.W.2d 166, 169
("If the operative provisions of a contract are ambiguous, recitals may be looked to for the purpose of construction and arriving at the intent of the parties").
We note that our research fails to reveal any substantive pro-nouncements by Ohio courts on the nature of recital clauses and their import. One commentator, in considering their use, has stated that, "[t]raditionally prefixed by the word whereas, contract recitals are not ordinarily drafted as promises or conditions." Farnsworth, Contracts (1982) 495, Section 7.10. However, "[a]lthough their proper role in the interpretation of the main body of the contract has sometimes been unclear, it is plain that they are frequently intended to, and often do, shed light on the circumstances the parties wished to have considered in the interpretation of the main body of the contract." Id. (Footnote omitted.)
Although plaintiff places great emphasis on the recital language and her claim that the trial court erred in its reliance on that language, the agreement at issue contains lengthy substantive provisions that were also interpreted by the trial court. To the extent that plaintiff's claim of error challenges the trial court's interpretation of the agreement, we note that determining the construction of a contract is a matter of law that is subject to de novo review. Dever v. Dever (Dec. 29, 2000), Clermont App. No. CA2000-01-007, unreported. Whether or not the recital language sheds light on or assists in construction of the main body of the agreement will be considered, if necessary, when we address the specific provisions of the agreement in conjunction with the trial court's interpretation of those provisions in distributing the various assets at issue.
In considering the specific terms of the agreement, the parties have set forth definitions for two types of property, namely "separate property" and "joint property." Initially, we note that under Ohio's statutory scheme, as set forth under R.C. 3105.171(A)(6)(a)(ii) and (iii), "separate property" is defined to include "[a]ny real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage," and "[p]assive income and appreciation acquired from separate property by one spouse during the marriage." Further, based upon statutory law, "[a]n increase in the value of separate property during the parties' marriage is marital property if that increase was due to the labor, money, or in-kind contributions of either spouse." Priester v. Priester (Nov. 17, 2000), Lake App. No. 99-L-103, unreported, citing R.C. 3105.171(A)(3)(a)(iii).
However, under the prenuptial agreement entered into by the parties in the instant case, the term "separate property" is defined differently than under Ohio statutory law. Specifically, the agreement defines "separate property" to mean all property that "he or she owned prior to the marriage, all of the income, appreciation, accretions or other benefits accruing upon his or her property during the marriage whether such income and appreciation is acquired passively or is due to the labor, monetary, or in-kind contribution of either spouse or both spouses during the marriage." (Emphasis added.) The agreement defines "joint property" in part as "[a]ll property acquired jointly by the parties during the course of their marriage as well as the income, appreciation, accretions or other benefits accruing to this jointly acquired property." Further, the agreement states that property "acquired jointly" by the parties during the marriage is to be divided "in shares equal to their financial contribution." The provision that division of "acquired jointly" property is to be based solely on recognition of the "financial contribution" of the parties is also different from Ohio law. Under the "ELEVENTH" paragraph of the agreement, the parties specifically acknowledge their understanding that they are giving up and waiving "their statutory right in some circumstances to share in income and appreciation on the Separate Property of the other, and any statutory right they may have in the Separate or conjugal property and earnings of the other."
We will now consider the specific distributions of the assets by the trial court challenged by plaintiff as contrary to the terms of the agreement. We first address the issue of the trial court's disposition of the Symix 401(K) account. The record indicates that, prior to the marriage, defendant owned a Keogh retirement account. At the time of the marriage the account was valued at $7,700, and it was rolled into a 401(K) account valued at $30,000, for a total valuation of $37,000. At the time the court valued the asset, it had grown in value to $141,568.59.
Plaintiff does not dispute that the $37,000 amount constitutes the separate property of defendant under the prenuptial agreement, as it represents assets acquired prior to the marriage. Plaintiff argues, however, that additional contributions to the 401(K) account during the marriage were made with marital income and marital matching funds, and that those contributions constituted marital property along with any corresponding appreciation.
In its decision, the trial court found that the 401(K) was defendant's separate property and an asset to which he alone made the financial contribution through his deferred compensation. The court also held that his employer's matching funds were in the nature of income. In so holding, the trial court cited Parzynski v. Parzynski (1992),85 Ohio App.3d 423, a case in which the court held that contributions made to an obligor by a company in which the obligor was fifty-percent owner are includable as income for purposes of a child support obligation. In the instant case, the trial court reasoned that defendant, as the majority owner of Symix stock, exercised control over the pension contribution made by Symix on his behalf, and that such deferred compensation was an integral part of defendant's annual compensation.
Based upon the terms of the agreement, we disagree with plaintiff's contention that the portion of the 401(K) account earned during the marriage was a marital asset. Assuming that we were addressing this issue under Ohio statutory law, we would agree with plaintiff that, in general, pension or retirement benefits accumulated during the marriage are considered marital property, subject to division. See Holcomb v. Holcomb (1989), 44 Ohio St.3d 128, 132. However, the plain language of the agreement at issue defines "separate property" to include all property owned prior to the marriage, as well as all "income, appreciation, accretions or other benefits" accruing upon such property during the marriage due to "the labor, monetary, or in-kind contribution of either spouse * * * during the marriage." Further, in addition to paragraph "FIRST" of the agreement, under paragraph "ELEVENTH," the parties waived any statutory right they may have in the "conjugal property and earnings of the other."
Here, we find that the trial court did not err in concluding that appreciation to the 401(K) account in the form of defendant's monetary contributions to the account, even though made during the marriage through his earnings, remained defendant's separate property under the agreement. We also find no error in the trial court's determination that the employer's matching contributions to the account constituted part of defendant's income as compensation for services performed. Parzynski, supra. Under paragraph "FIRST" of the agreement, income accruing upon defendant's separate property during the marriage due to his labor (during the marriage) remained his separate property. Further, although not the basis of the trial court's decision, we would also note that matching contributions to defendant's 401(K) plan made by his employer arguably represent "benefits" accruing to separate property during the marriage due to defendant's labor. Again, while such property might not constitute "separate property" under Ohio's statutory scheme, "Ohio law specifically provides for property to be excluded from marital property by the terms of a valid antenuptial agreement." Todd v. Todd (May 4, 2000), Franklin App. No. 99AP-659, unreported.
Similarly, we find no error in the trial court's decision awarding a life insurance policy to defendant. The record indicates that on October 1, 1992, shortly before the marriage, defendant acquired a New England Life Insurance Policy. The policy had no cash surrender value at that time. Plaintiff acknowledged before the trial court that the policy was acquired before the marriage. However, plaintiff challenges the trial court's award of the insurance policy to defendant based on plaintiff's contention that premium payments made during the marriage were made by defendant's employer as part of his marital employment and compensation.
The policy at issue is a "split-dollar" agreement between Symix and defendant, under which defendant collaterally assigned the policy to Symix. Pursuant to the agreement, Symix bore responsibility for the payment of premiums. A portion of the premium for the policy is taxable to defendant. At trial, defendant's expert, James Nesser, testified that defendant "has been paying income taxes on that portion of the premium that is paid by the company, but treated as a compensation to him, earnings or income to him." (Tr. Vol. III, at 61.)
The trial court held that, as the policy was purchased prior to the marriage, such policy was defendant's separate property, and the court also held that any increase in the cash surrender value also constituted defendant's separate property. The trial court determined that the employer's payment of premiums during the marriage on a life insurance policy issued for the benefit of defendant was in the nature of income to defendant.
We find no error with the court's characterization of this benefit as a form of income. Under the arrangement, defendant is receiving a tangible benefit from his employer's payment of the premiums, as he is not required to expend his own income to make the premium payments. Further, as noted above, part of the premium is taxable to defendant as income. Again, the definition of "separate property" under the prenuptial agreement includes not only all of the property owned by defendant prior to the marriage, but also all of the income or other benefits accruing upon such property during the marriage due to his labor. Thus, we will not disturb the trial court's award of the life insurance policy to defendant under the terms of the prenuptial agreement.
Plaintiff also contends that the trial court erred in its ruling as to certain Symix stock options. The record indicates that in December 1991, defendant was granted stock options involving shares of Symix stock. Because these shares were granted prior to the marriage, plaintiff does not challenge the award of these options to defendant. Defendant received further stock options through Symix on March 11, 1994 and August 23, 1994. Plaintiff maintains that because these stock options were acquired during the marriage, they did not constitute the separate property of defendant. Defendant, on the other hand, contends that the later acquired stock options are his separate property because the options represent "accretions" to the stock option plan granted prior to the parties' marriage.
At the outset, we disagree with defendant's contention that the stock options granted during the marriage are his separate property because they represent accretions to the prior stock option plan granted in 1991. While the original stock option plan may have existed prior to the marriage, our review of the stock option grants made during the marriage lead us to conclude that they represent separate agreements entered into between defendant and Symix. We note that the trial court, in its decision, similarly rejected defendant's claim that "the later award of stock options are accretions simply because they were awarded under the same original stock option plan that existed before the marriage." (Judgment Entry/Decree of Divorce at 30.) The trial court, however, awarded the later stock options to defendant based upon the court's finding that the stock options constituted a component of defendant's annual compensation and because plaintiff made no financial contribution to the acquisition of the options.
In general, "`a stock option may be defined as the right to buy a designated stock at any time within a specified period at a determinable price, if the holder of the option chooses.'" Banning v. Banning (June 28, 1996), Greene App. No. 95 CA 79, unreported, quoting Eric C. Hollowell, Annotation, Valuation of Stock Options for Purposes of Divorce Court's Property Distribution, 46 A.L.R. 4th 689, 691-692 (1986). The cases typically involve nontransferable stock options granted by an employer through a contract "as a benefit to an employee," and "[w]hether the options were granted to provide compensation for past or present services, or whether they were used to provide incentive, they usually terminate with the termination of the employment." Id.
Because we view the stock options granted during the marriage as independent of the original stock option plan granted in 1991, we do not consider whether these later acquired options constitute income (or accretions) accruing upon separate property. Rather, we look to the terms of the agreement regarding assets acquired during the marriage to determine whether these options are governed by the agreement. As previously indicated, "joint property" is defined under section (C) of the "FIRST" paragraph of the agreement as "[a]ll property acquired jointly by the parties during the course of their marriage as well as the income, appreciation, accretions or other benefits accruing to this jointly acquired property." Further, section (E) of the "FIRST" paragraph provides that, in the event of a divorce, "the parties agree to divide, in shares equal to their financial contribution thereto, the Joint Property." Thus, as previously noted, the division of joint property under the agreement requires a consideration of whether either or both of the parties made a "financial contribution" to such property.
In the instant case, the parties do not dispute the fact that plaintiff made no "financial contribution" to the stock options. The parties disagree, however, whether defendant made a financial contribution to acquire the options. Plaintiff notes that there was no evidence that defendant made any payment for the stock options. Defendant, however, maintains that he made a financial contribution by foregoing additional income in the form of a higher salary from his employer for the benefit of receiving the stock options.
In addressing this issue, we note that one of plaintiff's contentions is that the trial court erred in failing to consider her testimony as to the intent of the term "financial contribution." The trial court allowed plaintiff to make a proffer of this evidence; however, the court declined to consider extraneous evidence regarding the parties' intent based upon the court's view that the term was unambiguous. We find no error with the trial court's determination on this issue. In general, "if a contract is clear and unambiguous, its interpretation is a matter of law and no issue of fact exists to be determined." Aldahan v. Tansky Sales, Inc. (June 20, 2000), Franklin App. No. 99AP-651, unreported. Thus, "[o]nly where a contract is unclear or ambiguous or when the circumstances surrounding the agreement invest the language of the contract with a special meaning, will extrinsic evidence be considered in an effort to give effect to the parties' intentions." Id.
In the present case, although the term "financial contribution" is not defined in the agreement, such fact does not necessarily render the agreement ambiguous; rather, where a contractual term is not otherwise defined, we may look to the plain and ordinary meaning of the terms. Case v. Case (Oct. 29, 2001), Butler App. No. CA2001-04-075, unreported ("The intent of the parties to a contract is presumed to reside in the language they chose to employ in the contract, and common words will be given their ordinary meaning unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall content of the instrument").
The word "financial" means "relating to finance or financiers." Merriam-Webster's Collegiate Dictionary (10 Ed. 1995) 436. The word "finance" means "1: to raise or provide funds or capital for * * * 2: to provide with necessary funds in order to achieve a desired end." Webster's Third New International Dictionary (1966) 851. A "contribution" involves "a share contributed to any act or effect." Id. at 496.
As noted by plaintiff, defendant was not required to make any form of payment to acquire the stock options, i.e., defendant did not provide funds from income, earnings etc. to acquire the options. Rather, defendant's contribution to the stock options is in the nature of services rendered (or to be rendered). Article One of the stock option plan states that the purpose of the plan is to obtain and retain the services of participants, to encourage and reward efficient and profitable operation, and to promote the development of the business of the company. Defendant testified that the purpose of the options was to "make sure I didn't leave Symix." (Tr. Vol. III, at 157.) While we would find the meaning of the term "financial contribution" to be broader than mere cash payments, in the context of acquisition of the stock options at issue, we view defendant's contribution in the form of services to be more properly characterized as a nonfinancial contribution.
In the absence of a finding of a "financial contribution" by either party to the acquisition of the stock options, such options having been granted during the marriage, we conclude that the terms of the prenuptial agreement do not govern the disposition of this property, and we therefore look to Ohio statutory law for guidance. In this regard, "courts, including Ohio's, have held that stock options are property subject to allocation in divorce or dissolution actions." Banning, supra. One commentator has noted that, "[o]nce a court has decided that the option is property, it must then determine whether it has value and what that value is and define the period of service in exchange for which the option was granted." Sowald Morganstern, Domestic Relations Law (1997) 520, Section 12.21. Accordingly, a court must "find whether the period of service fell within the period of marriage," and once the marital component is found, "the court must formulate a feasible method of distribution." Id. Having concluded that the agreement does not provide terms specifically governing the disposition of this class of property, we remand to the trial court to reconsider the disposition of the Symix stock options under Ohio law as relating to the division of marital property, including a consideration whether the period of service fell within the period of the marriage (i.e., whether the options were granted for services performed during the marriage) or whether the period was for future services beyond the marriage.
Plaintiff next challenges the trial court's finding that defendant was entitled to the entire interest in Alkon, a company acquired during the marriage. At issue again is whether defendant made a "financial contribution" toward acquisition of this asset. Plaintiff notes that Alkon was acquired during the marriage through a leveraged buyout, under which defendant pledged his Symix stock and signed a promissory note to obtain the financing to purchase the company. While acknowledging that she did not make a financial contribution to the stock, plaintiff further maintains that defendant did not make a financial contribution because the pledge of his Symix stock did not involve surrendering any property in order for the Alkon stock to be titled in his name. Defendant disputes plaintiff's assertion that he made no financial contribution to obtain the interest in the company, asserting that his financial costs included personal loans and a loss of rights to a sizable number of his shares of Symix.
In considering the issue of whether a pledge of stock constitutes a "financial contribution," we find instructive language from Gilman v. Gilman (Va.App. 2000), 526 S.E.2d 763. In Gilman, the issue before the court was whether a husband's pledge of stock as security for down-payment loans on a real property investment constituted an "exchange," where the controlling statute in that jurisdiction defined "separate property" to include property acquired before the marriage and property acquired during the marriage in exchange for or from the proceeds of sale of separate property. In addressing that issue, the court in Gilman, at 769-770, had occasion to discuss the nature of a pledge, stating as follows:
 A pledge is a bailment of personal property as security for a debt. It is the lien created by the delivery of personal property by the owner to another upon an express or implied agree-ment that it shall be retained as a security for an existing or future debt. The essential elements of a pledge are that possession of the pledged property passes from the debtor to his creditor, that legal title remains with the debtor and that the creditor has a lien for payment of the debt due him by the debtor .
* * *
 Although [husband] retained legal title to the pledged shares, he surrendered rights to the stock that full legal title normally entails, namely, the unrestricted right to sell or transfer the shares to a third party. [Husband] surrendered possession of the stock, and his right to unilaterally sell the stock, in exchange for the loan proceeds. * * *
In Gilman, the court held that, where no marital effort was involved, "a stock pledge is simply a method to use separate property to acquire additional property." Id. at 770. Thus, the court found "no equitable rationale for classifying property acquired in this manner as marital property." Id.
We find persuasive the Gilman court's analysis that, although an individual who pledges stock retains legal title to the pledged shares, such a pledge involves the surrender of rights to stock that full legal title entails, including "the unrestricted right to sell or transfer the shares to a third party." Id. at 770. In considering the nature of such a transaction, we conclude that defendant's pledge of his Symix stock, utilized to acquire an interest in Alkon, constituted a "financial contribution," i.e., providing necessary funds or proceeds in order to achieve a desired result. Further, the record supports the trial court's finding that plaintiff made no financial contribution to the acquisition of the Alkon stock. Accordingly, we conclude that the trial court did not err in awarding the Alkon stock to defendant under the terms of the prenuptial agreement.
The next disposition of property challenged by plaintiff involves the property located at 10270 Olentangy River Road, as well as the adjoining 5.004 acres, including a gatehouse office. As noted under the facts, prior to the marriage, defendant owned property at 1590 Abbottsford Green, where the parties resided immediately after the marriage. That property was subsequently sold, and the parties purchased the residence on Olentangy River Road. As also previously indicated, the prenuptial agreement provides that plaintiff is entitled to an undivided one-half interest in the marital residence.
The trial court, in its disposition of the property, noted that the parties had stipulated the value of the Olentangy River Road property at $1,400,000 as of March 19, 1999, and the court further noted that the mortgage balance on that date was in the amount of $834,587.45. The trial court awarded the marital residence to defendant, but ordered defendant to pay plaintiff the sum of $282,706, representing the total equity in the property ($565,412) divided by two. The court also found that the 5.004-acre tract and the gatehouse office were the separate property of defendant.
Plaintiff asserts that the trial court erred in failing to award her an interest in the 5.004-acre tract and the gatehouse office. She argues that both parties made the decision to acquire the Olentangy River Road property, consisting of four condominium lots (including two lots with condominiums already built on the property), along with the adjoining 5.004 acres and gatehouse office building. The record indicates that a friend of defendant, Stewart Owens, agreed to buy one-half of the 5.004 acres to help offset the cost of the acquisition. Plaintiff contends that she trusted defendant in all matters surrounding this transaction, and that she believed one-half of the 5.004 acres was being sold to Owens. According to plaintiff, she was told that "someone else" had bought the gatehouse office, when in fact Owens and defendant acquired the gatehouse office. Plaintiff asserts the closing was complex, that either defendant or his attorney told her to sign various documents, and that it was not until discovery that she realized she was jointly titled to the home but that everything else was in defendant's name or titled with Owens. Plaintiff asserts that defendant usurped the marital opportunity for himself, and breached his fiduciary duty to the marriage and to plaintiff.
At the hearing, plaintiff acknowledged that her name was on a quitclaim deed regarding the five acres adjoining the house on Olentangy River Road, but she claimed she did not read it before signing. Plaintiff testified that, during the closing, she "went in and signed, signed, signed, signed, signed, and that was it." (Tr. Vol. 1, at 185.) Defendant, on the other hand, testified that plaintiff was aware, during the closing, of the quitclaim deed containing her signature. Defendant also stated that plaintiff's name was never on the deed to the five-acre tract property.
The trial court, in addressing the disposition of the 5.004 acres and gatehouse office, noted that Owens and defendant each possessed an undivided one-half interest in the property at issue, as evidenced by a quitclaim deed signed by plaintiff on April 25, 1995. The trial court rejected plaintiff's contention that she had been duped by defendant or defendant's counsel into signing the quitclaim deed to the acreage at the time of the closing when numerous documents were placed in front of her and she failed to read them carefully. The court specifically found that plaintiff's testimony lacked credibility based in part upon her testimony that she was unaware of incorrect statements on several documents she signed relating to property in Chicago. Plaintiff contends that the trial court improperly relied upon such evidence in finding that she lacked credibility.
However, because there was conflicting evidence, the trier of fact was required to make credibility determinations. In this regard, there was evidence before the trial court that plaintiff signed a mortgage document for a Chicago property on April 5, 2000, in which the document indicated that plaintiff was an "unmarried person." When asked during cross-examination whether she knew that she would be required, under Illinois law, to have her spouse waive a homestead right, plaintiff stated that she could not recall reading any representations that she was unmarried at the time she signed the document. Plaintiff was also questioned during cross-examination about a financial account she opened, signed by her on March 15, 2000, in which a "marital status" box was checked "divorced." Plaintiff acknowledged that she signed the document, but she contended that someone else had filled it out.
At trial, plaintiff admitted that, as early as March 1998, she was having an affair with Jerry Suqi. When questioned about her prior deposition testimony, in which she indicated that she was not having sexual relations with Jerry Suqi prior to the time she filed for a divorce in 1999, she explained that she apparently forgot that fact when questioned during the deposition. The trial court noted in its decision that "[a]n unrelated witness, however, testified that Cristi confided in her (about the affair) in early 1997 and even showed the witness a picture of Mr. Suqi at that time." (Judgment Entry/Decree of Divorce at 20.) The trial court also heard evidence that defendant became aware that a credit card had been issued and that plaintiff had charged thousands of dollars on the card. Defendant testified that he was sent a copy of the application and he discovered that somebody had signed his name to the application. Plaintiff admitted to defendant that she used the card, and when defendant asked plaintiff how she obtained the card without his signature, she "said she didn't know." (Tr. Vol. III, at 166.)
In the present case, the evidence before the trial court did not indicate that plaintiff was unintelligent, or that she was unable to read and understand documents. Further, where there was evidence suggesting that plaintiff may have provided erroneous information to facilitate other transactions, and where her responses during a deposition to questions regarding her relationship with Suqi were admittedly incorrect, the trial court was not required to blindly accept plaintiff's version of the facts concerning the closing on the Olentangy River Road property. Rather, the trier of fact is charged with responsibility for determining the credibility of testimony. Modon v. Modon (1996),115 Ohio App.3d 810, 817. In view of the conflicting testimony, we find that the trial court acted within its discretion in finding defendant's version more credible and in failing to find that plaintiff was misled or deceived into signing the quitclaim deed. Accordingly, we conclude that the trial court did not err in awarding defendant the acreage and gatehouse to the Olentangy River Road property.
Plaintiff also contends that the trial court erred in awarding her only the amount of $30,000 as the value for her share of the furniture in the marital residence. As indicated previously, during the marriage the parties sold the residence at Abbotsford Green and purchased new property on Olentangy River Road, where they converted two condominiums into one large residence. The trial court noted that plaintiff was not employed during this time and she did not liquidate any of her Symix stock to make any of the purchases of furniture for the new residence. The trial court also found, however, that the proceeds of the sale of the Abbotsford Green home were used to purchase some furniture and to complete work on the new residence, including extensive landscaping and contractors' fees. Defendant contended that, before any furniture purchases were made, the balance of any equity in the Abbotsford Green residence was depleted by extensive costs of completing and landscaping the new home.
The trial court noted that, while initial large expenditures were made to complete the home, defendant was also depositing his paycheck into his account, so that commingling of defendant's income with the equity money took place, even if an exact tracing of the money by defendant's expert was shown. The court found that "the remaining equity in Abbotsford was contributed to the overall costs of completing Kensborough, which included $300,000.00 in landscaping costs, contractor fees, as well as hundreds of thousands of dollars worth of furniture." (Judgment Entry/Decree of Divorce at 15.) The court further found that plaintiff's equity from the Abbotsford Green home "paled" in comparison to the total contribution defendant then made from income generated from premarital assets.
Plaintiff asserts that the trial court denied her an equal distribution because most of the purchases were made with monies from a checking account in defendant's name, even though most of the money came from the marital source of defendant's employment. We note that plaintiff does not appear to dispute the trial court's finding that she did not make any purchases of furniture from her own earnings. Plaintiff maintains, however, that any purchases made for furniture from defendant's earnings from his employment constituted marital property. While this argument might have merit under Ohio statutory law, under the "ELEVENTH" paragraph of the agreement at issue the parties waived "any statutory right they may have in the * * * conjugal property and earnings of the other." As noted, the trial court found that any portion of the proceeds from the Abbotsford Green property used to pay for furniture for the new residence "still paled in comparison to the other financial contributions Larry made to furnish, remodel and landscape Kensborough (which * * * have increased the value and which Cristi benefits from in her equity share)." (Judgment Entry/Decree of Divorce at 17-18.) In light of this finding, and given the language of the prenuptial agreement, we cannot conclude that the trial court abused its discretion in failing to equally divide these assets.
Plaintiff next challenges the trial court's award of the Florida beach house to defendant. There is no dispute that this beach house was acquired by the parties during the marriage and titled in their joint names, and the trial court found that such property constituted "joint property" as defined under the agreement. In addressing the distribution of this property, the court looked to the language of the agreement providing that "the parties agree to divide, in shares equal to their financial contribution thereto, the Joint Property." The trial court noted that both parties testified that plaintiff made no financial contribution to the beach house property. The court further noted that defendant had taken out a personal loan that he alone signed, and that defendant pledged $2,800,000 worth of Symix stock as security for the loan. The court found that defendant was entitled to the property because "he, alone, made the `financial contribution' under the common sense meaning of the terms of the Agreement." The trial court noted that defendant also made two interest payments on the property of over $100,000 each, and the court found that this money was paid through defendant's separate property. The record indicates that on February 6, 1999, defendant redeemed $103,012 worth of shares from a Brandywine Blue Mutual Fund, and the parties stipulated before the trial court that defendant's Brandywine Blue account was defendant's separate property. Defendant also argued before the trial court that the source of the funds for the other interest payment came from an account that represented defendant's separate property.
Again, similar to her contention regarding the Alkon stock, plaintiff asserts that, because defendant pledged Symix stock to leverage the purchase and secure a loan for the beach house property, he did not make a "financial contribution" to its acquisition. We have previously rejected plaintiff's contention that a pledge does not represent a form of financial contribution. Here, there is no dispute that the loan proceeds for the acquisition of the property were secured solely by defendant's pledge of separate property in the form of his Symix stock, for which he alone was liable on the note. Thus, we agree with the trial court's determination that defendant's pledge of stock, whereby he provided necessary funds to acquire the beach house, constituted a "financial contribution," and we therefore decline to disturb the trial court's award of this property to defendant.
Based upon the foregoing, plaintiff's first, third and fourth assignments of error are overruled. Plaintiff's second assignment of error is sustained to the limited extent that this matter is remanded for the trial court to reconsider its disposition of the Symix stock options, but this assignment of error is otherwise overruled.
Plaintiff's fifth and sixth assignments of error are interrelated and will be discussed together. Under these assignments of error, plaintiff contends that the trial court erred in finding a de facto termination of the marriage prior to the date of trial and by failing to value assets as of that date. Plaintiff argues that a de facto termination is prevented by the doctrine of clean hands, and she maintains that defendant breached his fiduciary duties to plaintiff by usurping the marital opportunities of the 5.004-acre property on Olentangy River Road and the gatehouse office. Plaintiff also contends that the evidence indicates that the parties continued to live together throughout the divorce proceedings.
In Crowder v. Crowder (Aug. 5, 1999), Franklin App. No. 98AP-1124, unreported, this court noted that:
 The date generally used for purposes of determining the value of marital property in a divorce action is the date of the final hearing. See R.C. 3105.171(A)(2)(a). However, if the court determines that use of this date "would be inequitable, the court may select dates that it considers equitable." R.C. 3105.171(A)(2)(b). Thus, the Ohio Supreme Court has held that under the particular circumstances of a given case, "[e]quity may occasionally require valuation as of the date of the de facto termination of the marriage." Berish v. Berish (1982), 69 Ohio St.2d 318, 320 * * *. A trial court's determination as to when to apply a valuation date other than the trial date is within the discretion of the trial court and will only be disturbed on appeal upon a demonstration of an abuse of that discretion. Gullia v. Gullia (1994), 93 Ohio App.3d 653, 666 * * *. However, as this court has recognized, a trial court abuses its discretion in failing to use an alternative valuation date when the record unequivocally indicates a clear and bilateral breakdown of the marriage prior to the hearing date. See Rogers v. Rogers (Sept. 2, 1997), Franklin App. No. 96APF10-1333, unreported (1997 Opinions 3556, 3568).
In determining that it would be equitable to use the date plaintiff filed the divorce complaint (June 22, 1999) as the de facto termination date of marriage, the trial court cited the following factors and circumstances: (1) while the parties both resided in the mansion on Olentangy River Road until the trial date, the home was so large they could remain separate; (2) plaintiff had residences in Chicago to which defendant had no access; (3) plaintiff had taken separate vacations with Jerry Suqi, her paramour, since 1997; (4) plaintiff had sexual relations with Suqi in 1998 in Atlanta, she has continued to date him and she gave him a key to her Chicago apartment; (5) plaintiff invested $25,000 in Suqi's restaurant in July 1998; (6) defendant took vacations with members of the opposite sex in the past year; (7) the parties have conducted separate financial lives since June 1999, when defendant stopped funding the joint checking account and temporary orders were issued; (8) the parties did not attempt reconciliation since the filing and they have not had sexual relations since perhaps spring 1997, and at least not since the filing of the action; and (9) the parties filed separate tax returns for 1999 and have not assisted one another in social, career or business functions.
In considering the totality of the circumstances, we cannot conclude that the trial court abused its discretion in finding a de facto termination of the marriage prior to the date of trial. To the extent that plaintiff contends defendant breached a fiduciary duty regarding the property on Olentangy River Road, we have previously found no error with the trial court's award of that property to defendant. Further, the record supports the trial court's findings that there was a breakdown of the marriage prior to the date of the trial. While there was evidence that plaintiff spent time in the marital residence when she was in Columbus, the record supports the court's finding that the mansion was large enough that the parties could remain separate. As also indicated by the court, plaintiff had residences in Chicago to which defendant had no access. In noting that the parties had conducted separate financial lives, that plaintiff had engaged in an extramarital affair, and that the parties had not assisted one another in social, career or business functions, the court relied in part upon this court's decision in Rogers v. Rogers (Sept. 2, 1997), Franklin App. No. 96APF10-1333, unreported. In Rogers, this court held that "an alternative valuation date should be employed when the totality of the circumstances and equitable considerations between the parties demonstrate that there was a clear and bilateral breakdown of the marriage and the parties have ceased contributing to each other for each other's benefit as would partners in a shared enterprise or joint undertaking." Under the circumstances of this case, plaintiff has not demonstrated that the trial court abused its discretion in using the filing date as the date of termination of the marriage.
Based upon the foregoing, plaintiff's fifth and sixth assignments of error are without merit and are overruled.
Under her seventh assignment of error, plaintiff contends that the trial court abused its discretion in failing to award her spousal support. Plaintiff maintains that the provisions regarding spousal support in the prenuptial agreement are no longer equitable, and that spousal support is necessary in order for her to enjoy the lifestyle she became accustomed to during the marriage.
The prenuptial agreement entered by the parties addressed the issue of maintenance under the "SEVENTH" paragraph, and that provision states as follows:
 SEVENTH: (A) Larry hereby releases and waives any and all right to receive alimony, spousal support, or maintenance payments of any kind, whether temporary or permanent, from Cristi in the event of an annulment, legal separation, dissolution of marriage or divorce.
 (B) Cristi hereby releases and waives any and all right to receive alimony, spousal support, or maintenance payments of any kind, whether temporary or permanent, from Larry in the event of an annulment, legal separation, dissolution of marriage or divorce except as follows: (1) if the parties have been married for five (5) years or longer prior to any court filing being made to terminate this marriage, Larry may be required to pay alimony to Cristi if, but only if: (a) the court before which the action to terminate the parties' marriage is pending concludes that the payment of alimony by Larry to Cristi is necessary; and (b) Larry is gainfully employed and earning as wages, salary and bonuses at least $150,000.00 annually; and (c) Larry's net earnings from wages, salary and bonuses for the two years preceding the initiation of the action to terminate the parties' marriage are at least fifty percent (50%) more than Cristi's. If these three conditions precedent are met then the court shall not be precluded by this Agreement from awarding Cristi alimony (1) up to $5,000.00 per month or (2) an amount necessary to bring her standard of living up to that enjoyed by the parties during their marriage (taking into account her earnings, and earning ability) or (3) an amount equal to thirty percent (30%) of the average net earnings (from wages, salary and bonuses) of Larry over the prior three years as reflected in the tax forms filed by the parties, whichever amount is less. * * * [Emphasis sic.]
In Gross, supra, at 108-109, the court discussed not only the disposition of property in cases involving a prenuptial agreement, but, also, the issue of sustenance or maintenance support, holding in part:
 Upon the consideration of provisions relating to the division or allocation of property at the time of a divorce, the applicable standards must relate back to the time of the execution of the contract and not to the time of the divorce. As to these provisions, if it is found that the parties have freely entered into an antenuptial agreement, fixing the property rights of each, a court should not substitute its judgment and amend the contract. A perfect or equal division of the marital property is not required to withstand scrutiny under this standard. * * *
 In the review of provisions in antenuptial agreements regarding maintenance or sustenance alimony, a further standard of review must be applied one of conscionability of the provisions at the time of the divorce or separation. Although we have held herein that such provisions in an antenuptial agreement generally may be considered valid, and even though it is found in a given case upon review that the agreement had met all of the good faith tests, the provisions relating to maintenance or sustenance may lose their validity by reason of changed circumstances which render the provisions unconscionable as to one or the other at the time of the divorce of the parties. Accordingly, such provisions may, upon a review of all of the circumstances, be found to have become voidable at the time of the divorce or dissolution. [Fn. omitted; emphasis sic.]
Under the terms of the agreement at issue, plaintiff waived her right to alimony or spousal support subject to certain exceptions, including the provision that defendant "may" be required to pay alimony upon a finding by the court that such an award is "necessary." In the present case, the trial court concluded that an alimony award was not necessary. In so holding, the trial court noted the following factors: plaintiff received over $1,000,000 in assets at the time the agreement was entered; she has continued to live an extravagant lifestyle in spite of the fact she is receiving minimal spousal support; although plaintiff claims that her monthly expenses are almost $18,000, including $800 for meals out, $1,200 for clothing, $4,158 for mortgage payments and $1,000 for "incidentals," such monthly expenses "obviously * * * include more than the everyday necessities." (Judgment Entry/Decree of Divorce at 33.); plaintiff, who is intelligent, articulate, and educated, has failed to find employment and gave no credible reason why she had not attempted to seek employment; plaintiff was not out of the workforce for a significant time during the parties' short marriage, and she made a decision not to attempt to re-enter the workforce despite the fact she was only awarded temporary spousal support through May 31, 2000; plaintiff's claim that she could not find work because she did not know where she was going to eventually reside was somewhat "ingenuous" in light of the fact that she has two properties in Chicago; and, the deposition testimony of Jerry Suqi's wife indicated that Suqi had traveled with plaintiff to Puerto Vallarta, Palm Springs and Barbados, and that plaintiff had taken Suqi to Michigan and New York, with plaintiff paying for the trips.
Upon review, we cannot conclude that the trial court's decision not to award spousal support was unconscionable. The marriage at issue was relatively short, lasting approximately six and one-half years. Plaintiff, who was in her mid-thirties and in good physical health at the time of the trial, worked during the early part of the marriage and earned over $80,000 per year. She has marketable skills and is capable of full-time employment. At the time of the marriage, plaintiff did not have substantial financial assets but, under the terms of the prenuptial agreement, she received $1,000,000 in stock and one-half of the value of the marital residence. While the marital standard of living is one of the statutory factors to consider under Ohio law, we note that, despite plaintiff's claim that she needed nearly $18,000 per month in order to maintain her standard of living, the trial court was not required to find that every luxury she enjoyed during the marriage was "necessary." See Simoni v. Simoni (1995), 102 Ohio App.3d 628, 637 (spouse is not entitled, as a matter of law, to continuous luxurious lifestyle as lived by the parties during the marriage). The trial court could have reasonably concluded that plaintiff had ample assets, as well as necessary skills and training, to be self-supporting. Further, the record supports the trial court's finding that plaintiff, rather than seeking employment during the time she was receiving temporary support for a certain period, chose instead to travel and pursue other interests, including her equestrian pursuits. Accordingly, we find no abuse of discretion by the trial court in its enforcement of the agreement pertaining to spousal support.
Plaintiff's seventh assignment of error is without merit and is overruled.
Under her eighth assignment of error, plaintiff asserts that the trial court erred in awarding the parties' dog, "Jordan," to defendant. The trial court found that the parties had a nine-year old Sheltie named Jordan, and that plaintiff also had another dog ("Joey") that she purchased after the divorce action was filed. The trial court determined in part that Jordan should be awarded to defendant because the dog resided in the marital home, which was large and had expansive property. We note that the parties presented conflicting testimony regarding the acquisition of the dog. Plaintiff testified that the dog "was mine in the beginning." (Tr. Vol. I, at 222.) In her appellate brief, plaintiff asserts that defendant bought the dog for her as a gift. Defendant testified that he never gifted the dog to her, and that any such suggestion was "completely wrong." (Tr. Vol. III, at 210.) Based upon the record in this case, we cannot conclude that the trial court's decision to award Jordan to defendant constituted an abuse of discretion.
Plaintiff's eighth assignment of error is overruled.
We will next address defendant's two assignments of error on cross-appeal. Under his first assignment of error, defendant contends that the trial court erred in awarding plaintiff $30,000 as a portion of the value of the parties' furniture and accoutrements from the marital residence. Defendant argues that the evidence presented at trial established that all of the furnishings at the parties' marital residence on Olentangy River Road were purchased from funds earned and contributed by defendant. Defendant also argues that plaintiff failed to show that any of the proceeds from the sale of the Abbotsford Green property were used to purchase furniture for the Olentangy River Road home.
We have previously addressed the court's award of $30,000 to plaintiff as value for her share of the furniture in the Olentangy River Road residence. In our prior discussion, we noted the trial court's finding that equity in the sale of the Abbotsford Green residence was contributed to the overall costs of completing the new residence, including extensive costs for landscaping, contractor fees and "hundreds of thousands of dollars worth of furniture." (Judgment Entry/Decree of Divorce at 15.) While defendant asserts that the proceeds from the sale of the Abbotsford Green home were depleted before any furniture was purchased for the new residence, the trial court noted that during this time defendant was depositing his paycheck into his account, "so commingling of Larry's income with the equity money occurred even if an exact tracing of the money * * * was shown." (Judgment Entry/Decree of Divorce at 15.) The trial court acknowledged that it was "not an easy task" to attempt to compare dollar for dollar the proceeds from the sale of the Abbotsford Green house "versus the other money spent, and then come up with an exact ratio and finally determine an exact fair market value with depreciation to which to apply the ratio." (Judgment Entry/Decree of Divorce at 18.)
We agree with the court's assessment that it was faced with a difficult task in attempting to separate proceeds from the sale of the former residence from other money spent during this time. We further note that the trial court was presented with conflicting testimony from both sides as to the value of the furnishings. In this regard, the trial court found the testimony of defendant's expert regarding the valuation of the furniture to be "ridiculously low," and the court similarly discredited a report by the same witness. Despite the difficulties in tracking the various amounts, as well as the conflicting testimony concerning valuation, we are convinced that the trial court carefully attempted to determine defendant's separate property versus property deemed to be joint property under the terms of the agreement. Upon review, we cannot conclude that the trial court abused its discretion in its disposition of the assets at issue.
Accordingly, defendant's first assignment of error on cross-appeal is overruled.
Under his second assignment of error on cross-appeal, defendant asserts that the trial court erred in failing to obligate plaintiff to pay one-half of a pledge to a charitable organization. Specifically, defendant argues that, during the marriage, the parties discussed and agreed together to pledge the amount of $25,000 to Big Brothers/Big Sisters. Defendant argues that plaintiff had been involved with the charity during the parties' marriage and that the pledge was made jointly by the parties over a year prior to the divorce. Defendant maintains that the pledge should be considered joint property to which both parties contributed equally.
Plaintiff argues that the evidence indicates defendant was the only individual who signed the debt. Plaintiff also argues that the trial court did not assign the debt to defendant as his separate property, but, rather, the court assigned the debt to him because of equitable considerations. We agree. In its decision, the trial court determined that defendant should be solely responsible for the pledge, noting that, while plaintiff approached her husband about making the pledge, defendant agreed to make the contribution. The court further noted that defendant was earning the sole income the parties were expending at the time. Under these circumstances, we find no abuse of discretion by the trial court in allocating this obligation to defendant. Defendant's second assignment of error on cross-appeal is without merit and is overruled.
Based upon the foregoing, plaintiff's first, third, fourth, fifth, sixth, seventh and eighth assignments of error are overruled and plaintiff's second assignment of error is sustained to the limited extent provided, but is otherwise overruled. Further, defendant's first and second assignments of error on cross-appeal are overruled. Accordingly, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations is affirmed in part and reversed in part and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this decision.
Judgment affirmed in part, reversed in part, and cause remanded.
TYACK, P.J., and LAZARUS, J., concur.